21-2167

# United States Court of Appeals for the Federal Circuit

---

**COOPERATIVE ENTERTAINMENT, INC.**,

*Plaintiff-Appellant*

v.

**KOLLECTIVE TECHNOLOGY, INC.,**

*Defendants-Appellee*

---

Appeal from the United States District Court for the Northern District of California, Case No. 5:20-cv-07273, District Judge Edward J. Davila

---

## OPENING BRIEF OF APPELLANT COOPERATIVE ENTERTAINMENT INC.

---

Meredith Martin Addy
*(counsel of record)*
**ADDYHART P.C.**
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com

Benjamin M. Cappel
**ADDYHART P.C.**
401 N Michigan Ave, Suite 1200-1
Chicago, Illinois 60611
732.991.7285
benjamin@addyhart.com

Matthew M. Wawrzyn
**Wawrzyn LLC**
200 East Randolph Street
Suite 5100
Chicago, Illinois 60601
312.235.3120
matt@wawrzynlaw.com

November 19, 2021

***Attorneys for Plaintiff-Appellant Cooperative Entertainment, Inc.***

## CLAIM 1 OF U.S. PATENT NO. 9,432,452

1. A system for virtualized computing peer-based content sharing comprising:

at least one content delivery server computer constructed and configured for electrical connection and communication via at least one communications network; and

at least one peer-to-peer (P2P) dynamic network including a multiplicity of peer nodes, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the multiplicity of peer nodes are constructed and configured for electronic communication over the at least one P2P dynamic network, wherein the at least one P2P dynamic network is based on at least one trace route; wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;

wherein the at least one content delivery server computer is operable to store viewer information, check content request, use the trace route to segment requested content, find peers, and return client-block pairs;

wherein distribution of P2P content delivery over the at least one P2P dynamic network is based on content segmentation;

wherein content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques.

Appx036, 10:25-54.

## CERTIFICATE OF INTEREST

Counsel for Appellant Cooperative Entertainment, Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    **Cooperative Entertainment Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    **None.**

3. **Parent Corporations and Stockholders**. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

    **None.**

4. **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

    (a) **Todd Christopher Atkins**
    **Atkins & Davidson, APC**

    (b) **Not applicable**.

5. **Related Cases**. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47.4(a)(5) and 47.5(b).

    **None.**

6. **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). See Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated: November 19, 2021

By: /s/ *Matthew M. Wawrzyn*
Matthew M. Wawrzyn

# TABLE OF CONTENTS

CLAIM 1 OF U.S. PATENT NO. 9,432,452 .......... i
CERTIFICATE OF INTEREST .......... ii
TABLE OF CONTENTS .......... iv
TABLE OF AUTHORITIES .......... vi
STATEMENT OF RELATED CASES .......... 1
JURSIDICTIONAL STATEMENT .......... 1
STATEMENT OF THE ISSUES .......... 1
STATEMENT OF THE CASE .......... 2
I. Procedural History .......... 2
II. The Invention of the ’452 Patent .......... 3
A. The Problem and the Solution Presented by the ’452 Patent .......... 5
B. The ’452 Patent’s Teaching of How One of Skill Would Build the Dynamic P2P Network .......... 10
C. Implementation of the Claimed Invention .......... 14
III. The Factual Allegations of CEI’s Amended Complaint .......... 15
SUMMARY OF THE ARGUMENT .......... 17
ARGUMENT .......... 20
I. Standard of Review .......... 20
II. Contrary to the District Court Generalizations of the Specification, The Claim Language Satisfies *Alice* Step One .......... 21
A. The District Court Failed to Determine That the Claims Were Specifically Directed to the Use of Trace Routes to Segment User Content Over a Dynamic P2P Network .......... 21
1. Reliance on Generalized Proxy Language Instead of Claim Language Is Improper .......... 23
2. Determining that the Claims Cover “Mere Manipulation of Data” Ignores the Import of the Claims and Improperly Resolves Inferences Contrary to the Non-Movant .......... 25

B. The District Court Ignored the '452 Patent's Advantages and Improperly Required Some "Special Technology" ........................ 26

1. The '452 Patent Explicitly Identifies Advantages Gained Through Increased Capacity, Among Others ........................ 26

2. Contrary to the District Court, Patent Specifications Are Not Required to Disclose "Special Technology" ........................ 28

C. The District Court's Improper "Functional Language" Conclusion Also Ignores the Specifics of the Claim Language ......... 30

D. The Claim Limitations Specifically Require an Improved Dynamic P2P Network Based on Segmenting Content on a Trace Route. ........................ 33

III. The District Court Legally Erred Under *Alice* Step Two Because the Asserted Claims of the '452 Patent Teach the Inventive Concept of Using Information from a Trace Route to Create a Dynamic P2P Network ........................ 38

A. Contrary to the District Court's Conclusion, a Patent is Presumed Valid and the Examiner is Presumed to Have Done Their Job ........................ 38

B. The District Court Improperly Required the Claims To "*Solely* Rely on Trace Routes" to Establish Inventive Concept ........................ 41

C. The District Court Improperly Applied § 112 to the Specification, Even Though the Rule 12 Motion Was on § 101 ........ 43

D. The District Court Missed the Inventive Concept Because It Failed to Appreciate the Claims' Engineering Requirements. .......... 45

IV. Under Ninth Circuit Law, the Factual Allegations in the Amended Complaint Preclude Rule 12 Dismissal Under ........................ 47

V. The District Court Legally Erred by Invalidating the Entire '452 Patent, Even Though it Only Analyzed Claims 1 and 5 ........................ 48

CONCLUSION ........................ 50

PROOF OF SERVICE ........................ a

CERTIFICATE OF COMPLIANCE ........................ b

ADDENDUM ........................ i

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) ........ 26, 33, 45, 48

*Affinity Labs of Texas, LLC v., DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016). ........ 37

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ........ passim

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ........ 25, 40

*Ariad Pharm. Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ........ 34

*CardioNet, LLC v InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) ........ 42

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019), ........ 51, 52

*CLS Bank Int'l v. Alice Corp. Pty.*,
717 F.3d 1269 (Fed. Cir. 2013) ........ 44

*Core Wireless Licensing S.A.R.L. v. LG Elec., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) ........ 42

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ........ 41

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ........ 29

*Diamond v. Diehr*,
450 U.S. 175 (1981) ........ 47

*Dow Chem. Co. v. Nova Chem. Co. (Canada)*,
809 F.3d 1223 (Fed. Cir. 2015) ........ 50

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ........ 40, 41

*Finjan, Inc. v. Blue Coat Sys, Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .................................................................. 42

*Fox Grp., Inc. v. Cree, Inc.*,
700 F.3d 1300 (Fed. Cir. 2012) .................................................................. 54

*Hall v. Bed Bath & Beyond, Inc.*,
705 F.3d 1357 (Fed. Cir. 2013) .................................................................. 46

*In re TLI Commc'ns LLC Pat. Litig.*,
823 F.3d 607 (Fed. Cir. 2016) .............................................................. 25, 37

*Koninklijke KPN N.V. v. Gemalto M2M GMBH*,
942 F.3d 1143 (Fed. Cir. 2019) ...................................................... 28, 39, 42

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) ........................................................................................ 47

*Mentone Solutions LLC v. Digi Int'l, Inc.*,
21-1202 (Fed. Cir. Nov. 11, 2021) ........................................................ 26, 29

*Microsoft Corp. v. i4i Limited Partnership*,
564 U.S. 91 (2011) .................................................................................. 24, 43

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ................................................................. 25, 52

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .................................................................. 25

*Sandt Tech, Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) .................................................................. 53

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ................................................................... 25

*Streck, Inc. v. Res. Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed. Cir. 2012) .................................................................. 54

*Thales Visionix, Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017) .................................................................. 40

*Two-Way Media, Ltd. v. Comcast Commun'cn, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ........................................................................ 36

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709, 721 (Fed. Cir. 2014) .................................................................. 44

*Uniloc USA, Inc. v. LG Elec. USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020) ................................................................ 42, 51

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991) ........................................................................ 49

*Visual Memory LLC v. NVIDIA Corp*,
867 F.3d 1253 (Fed. Cir. 2017) ........................................................... 27, 41, 53

*WhiteServe LLC v. Dropbox, Inc.*,
19-2334 (Fed. Cir. Apr. 26, 2021) ................................................................... 27

**Statutes**

35 U.S.C. § 101 ............................................................................................. passim

35 U.C. § 112 ......................................................................................... 29, 43, 44

Federal Rule of Civil Procedure 12 ................................................................ passim

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, counsel for Appellant Cooperative Entertainment Inc. ("CEI") states: (a) no other appeal in or from the same civil action in the trial court was previously before this or any other appellate court; and (b) no other case known to counsel to be pending in this or any other court will directly affect or be directly affected by this Court's decision in this appeal.

## JURSIDICTIONAL STATEMENT

This action arose under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.* Thus, the District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) The Court of Appeals has jurisdiction under 28 U.S.C. § 1295. CEI seeks review of the District Court's June 21, 2021 final order granting Kollective Technology, Inc.'s ("Kollective") Motion to Dismiss Under Rule 12(b)(6), dismissing with prejudice CEI's Amended Complaint for failure to state a claim upon which relief may be granted, and entering final judgment. CEI timely filed a notice of appeal on July 21, 2021.

## STATEMENT OF THE ISSUES

1. Whether the district court legally erred in determining on the pleadings that all of the claims of U.S. Patent No. 9,432,452 (the "'452 Patent") are directed to an abstract idea under *Alice* Step One, even though the asserted claims specifically

require a dynamic peer-to-peer network that uses trace routes to segment internet content to its members.

2. Whether the district court legally erred in determining on the pleadings that all of the claims of the ’452 Patent lacked inventive concept under *Alice* Step Two, even though CEI specifically plead and argued that the inventive concept was the “use [of] trace[]routes to identify common content that will be consumed by the peers and then segmenting and distributing the content based on the trace[]route.”

3. Whether the allegations of CEI’s Amended Complaint raise a factual dispute that precludes entry of judgment for Kollective at the pleadings stage under Federal Rule of Civil Procedure 12(b)(6).

4. Whether the district court both legally erred and lacked jurisdiction to determine that the entire ’452 Patent, including all claims 1-16, was invalid for failing to satisfy 35 U.S.C § 101, because the court only mentioned claims 1 and 5 in its decision, and CEI only asserted claims 1-3 and 5 in its Amended Complaint.

## STATEMENT OF THE CASE

### I. Procedural History

In October of 2020, CEI sued Kollective for infringement of claims 1-3 and 5 of the ’452 Patent in the Northern District of California, and in January 2021, Kollective responded with a Motion to Dismiss under Rule 12(b)(6). Appx039-041. CEI filed an Amended Complaint in February 2021, Appx043. Kollective filed a

second Motion to Dismiss shortly thereafter, Appx080, asserting that all claims of the ’452 Patent were invalid as lacking patent eligible subject matter. Appx102-103. CEI opposed, Appx214, and Kollective replied. Appx266. The district court took the motion “under submission without oral argument,” Appx041, and in June 2021, the district court granted Kollective’s Motion to Dismiss, holding the ’452 Patent invalid as lacking patent-eligible subject matter. Appx015. Judgment was entered contemporaneously, Appx016, and CEI timely appealed. Appx041.

## II. The Invention of the ’452 Patent

The ’452 Patent, titled Systems and Methods for Dynamic Networked Peer-to-Peer Content Distribution, issued on August 30, 2016 and was assigned to Joosy, Inc. Appx017. At the time of the ’452 Patent invention, content distribution networks (“CDN”) managed and controlled distribution of online video by pushing content “top down” from the CDN to peer-2-peer (“P2P”) networks. *Id.*; Appx032, 1:17-21; *see also* 1:22-3:34 (describing prior art CDN to P2P networks). There were problems with this “top down” distribution, including limitations with a static server (i.e., CDN) to peer network, such as lack of redundancy and limited computing capacity. The ’452 Patent specification addressed that the invention overcomes these short comings:

> The systems and methods of the present invention provide for harnessing the content recipient devices to aggregate or assemble intelligent functionality of the devices unassociated with the content

> receipt, including but not limited to computational storage and processing capacity of the content recipient devices in the P2P dynamic network ....

Appx036; 9:54-60; *see also* Appx034, 5:28-30. The '452 Patent's dynamic P2P networks differ from the prior art CDN to P2P networks because the new dynamic networks do not require a server to oversee their communication or to provide centralized storage. Appx034, 5:56-58.

Joosy was founded in 2012, by the inventors of the '452 Patent to develop and bring to market a product embodying their invention to improve the delivery of online video. Appx044. Joosy developed a product called JoosyCloud that lowered the cost of online video delivery and improved the end-user experience. *Id.* JoosyCloud embodied the system and method covered by the '452 Patent, provides a virtual network layer that allows users to stream video over a P2P network, outside the structure of a CDN. *Id.* As the '452 Patent teaches:

> It is an object of this invention to provide P2P dynamic networks and/or sub-networks for file distribution between peers receiving the same content. ... [E]mbodiments of the present invention include dynamic networks based upon trace route, e.g., CDN internet protocol (IP) addresses.

Appx033, 1:48-54.

Importantly, the P2P dynamic network formed around peer nodes that "are established and/or defined based on their consumption of the same content, i.e., peer nodes are receiving the same content," Appx033, 1:63-65; 10:32-34 (claim 1); 11:4-

6 (claim 5). These P2P dynamic networks were outside of the control of the CDN. Appx033, 1:41-43; 10:37-42 (claim 1); 11:8-11 (claim 5). Once the CDN pushed down the content, the dynamic P2P networks could share that content freely, without regard for the strictures of the CDN. *Id.*; Appx049, ¶ 25 ("The benefit of this 'bottom up' approach is manifold and generally directed to addressing the capacity problem. If control is passed to the P2P dynamic network, then capacity may be substantially addressed—and in some cases exclusively addressed—by the P2P dynamic network."). In 2018, Joosy assigned the '452 Patent to CEI, Appellant here.

### A. The Problem and the Solution Presented by the '452 Patent

The '452 Patent recognized that "sharing digital content, including video, for live streaming service over content distribution networks (CDNs)" was known. Appx032, 1:17-20. The prior art taught that distribution of shared content was controlled through the CDN. Appx033, 4:58-60 (stating that the prior art directs the content "from the CDN server directly to each recipient node."). Because the distribution and the content was controlled from the CDN server, the owner of the CDN server controlled the content provided to a specific subscriber P2P network group. Appx034, 5:14-27; Appx047 ("According to the prior art, the CDN server pushed the digital content from node to node.").

The inventors of the '452 Patent recognized the problems with being restrained to the CDN and developed a solution that allows users outside the CDN

to share content. Specifically, the ’452 Patent teaches dynamic P2P networks outside the control of the CDN: “It is an object of this invention to provide P2P dynamic networks ... for file distribution between peers receiving the same content.” App033, 3:48-50. In fact, the ’452 Patent specifically called out its improvement: “The prior art fails to provide video streaming over P2P networks outside the structure and control of CDNs.” Appx033, 3:35-36.

One of the claimed virtual network’s defining features is that each peer or user in the network is consuming the same content as the other peers. Appx033, 3:44-46; 3:48-50; 3:63-65; 4:52-60; 4:63-65; Appx034, 5:7-9; 5:21-24; 5:35-38. Through this process, “[P]eer nodes or content recipients of the same content provide for redirected content delivery among peer nodes (or users), thereby by-passing any established or static content delivery network (CDN).” Appx034, 5:38-42; *see also* Appx034, 6:30-37 (describing with reference to FIG. 11 an algorithm teaching how the dynamic P2P networks are formed). The content provider does *not* dictate what device will be a peer with another device. “[T]he content distributed via the peer nodes of the present invention does ***not*** establish the ‘peerness’ ....” Appx034, 5:18-19 (emphasis added). Neither does the device’s location define its peer. “[T]he P2P connection[] is *not* physical location-dependent, control-dependent, or ownership-dependent ....” *Id.*, 5:19-21 (emphasis added). “[T]he peerness of peer nodes of the present invention [is] established by the commonality of the content consumed

therebetween." *Id.*, 5:22-24; Appx034, 6:51-54; 6:63-65; *but see* Appx034, 6:20-24 (stating that proximity of physical location is a factor).

In other words, the claimed network is outside the control of the CDN—defined by the content consumed by the other peers in the network. *See, e.g.,* Appx033, 3:40-46; 3:48-50; 3:63-65; 4:52-60; 4:63-65; Appx034, 5:7-9; 5:21-24; 5:35-38; Appx036, 9:48-54. The claimed P2P network also is dynamic, because each peer—by requesting the common content to be consumed—defines that peer's participation in the network. Appx018 (Fig. 1: client "Initiate[s] Communication" with a "content request"); Appx037, 11:12-13 (claim 5: "the at least one content delivery server computer receiving at least one content request from a client ....") Whereas the prior art required the CDN to control the content and push the content to the pre-defined, static P2P network (e.g., subscribers to the CDN's content), the '452 Patent defines the P2P network dynamically according to each peer requesting to consume the same content. *Id.*; *see also* Appx033, 4:45-60.

The '452 Patent states advantages of the claimed dynamic networks as including:

- "more efficient and reduced cost of delivery for the content, as well as optionally providing live streaming for video and/or audio content as well as data, files, analytics, and combinations thereof," without requiring static subscription to the CDN. Appx033, 4:49-53.
- "increased reliability, more redundancy, and more efficient delivery than those of the prior art." Appx034, 5:28-30.

- "redirected content delivery among peer nodes (or users), thereby ***by-passing any established or static content delivery network*** (CDN); advantageously, this saves time, improves redundancy and also reduces or eliminates costs for content delivery over the CDN to the peer notes. Appx034, 5:40-44 (emphasis added).

- "identifies those peer node that are in close proximity to each other and uses them to distribute content to each other or ***create more efficient content delivery*** thereby." Appx034, 5:45-48 (emphasis added).

Appx033, 4:49-51; *see also* Appx049, ¶ 25 ("[T]he computing capacity of the client devices consuming the video content is leveraged and used to the maximum extent, according to the '452 patent claims."); *accord* Appx067, ¶ 25.

The '452 Patent sums-up the advantages of offloading network capacity to a dynamic P2P network consuming the same content:

> Advantageously, another aspect of the systems and methods of the present invention provide for simulation to leverage the hardware of the peer node content recipient devices for providing coordinated analytics, for example on large data sets. The data is retained within the community or peers (i.e., peer nodes determined by peerness or commonality of data being distributed thereto and/or therebetween). Thus, ***the present invention provides for leveraging communities sharing common content with each other over the dynamic network(s) and/or sub-network(s) without the content being distributed directly from the CDN server originating the content, and without the content distribution being limited or otherwise restricted by the established (static) CDN network(s)***. The systems and methods of the present invention provide for harnessing the content recipient devices to aggregate or assemble intelligent functionality of the devices unassociated with the content receipt, ***including but not limited to computational storage and processing capacity of the content recipient devices in the P2P dynamic network, as in grid computing applications for massively parallel computation in addition to the P2P content distribution and redundancy of online content distribution to receiving or recipient peer node devices***.

Appx036, 9:41-63 (emphasis added). Each claim requires "Virtualized computing peer-based content sharing." Appx036 (claims 1 and 5). CEI alleged that to be "virtualized," the claims require the "multiplicity of peer notes ... distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network ...." Appx048, ¶ 21; *accord* Appx066, ¶ 21.

Additionally, the '452 Patent discloses a way that CDN owners also may take advantage of the claimed dynamic P2P networks by providing their subscribers with economic incentives for highly demanded content:

> In yet another beneficial application of the systems and methods of the present invention, economically driven incentives to peer nodes or content recipients include savings, compensation, points, credits, and combinations thereof, are provided for participation by the recipient devices (peer node devices receiving the common content), i.e., to encourage, promote, incentivize, or increase the number of peers for any piece of content, thereby providing elasticity of the dynamic CDN when the demand for any particular content is highest or at high levels for periods of time. A virtual currency may thus be provided to encourage the multiplicity of peer node content recipient devices to participate within the dynamic network(s) and/or sub-network(s) for receiving more content (for example viewing more video downloads) and thereby participating in more than one of the dynamic networks due to increased frequency and type of content.

Appx036, 9:64-10:13.

### B. The ’452 Patent’s Teaching of How One of Skill Would Build the Dynamic P2P Network

Two of the claimed requirements to build a dynamic P2P virtual layer to share content between peers were found by the Patent Office to define over the prior art. Appx0245 (Examiner’s Statement of Reasons for Allowance) First, the claims require the request for the content to define the P2P network. Appx036, 10:42-43 (“wherein the at least one content delivery server computer is operable to . . . check content request . . . .”); Appx037, 11:12-14 (“the at least one content delivery server computer receiving at least one content request from a client . . . .”). Second, the claims use the quality of the connection through a trace route between the peers sharing the content to define the P2P network. Appx036, 10:42-43 (“wherein distribution . . . is based on content segmentation . . . wherein content segmentation is based on . . . server side scheduling/resource allocation techniques.”); Appx037, 11:14-20 (“the . . . content delivery server computer segmenting requested content based on . . . server side scheduling/resource allocation techniques . . . .”).

It was known in the prior art to use trace routes to test the path and ensure the connection in order to push the data from the CDN to the client peer (i.e., CDN subscriber). Appx046 (“Weller’s servers perform network traffic tests including traceroutes, pings, file downloads . . . to maintain network conditions.”). The at-issue claims, by contrast, use these resource allocation techniques in the other direction, taking content already pushed from the CDN and sharing it with other

users, through the use of a trace route to identify client peers requesting the same content (i.e., user-to-user, instead of CDN to user), and thus creating a network between and among the peers that more efficiently shares the content. Appx034, 5:49-58.

The ’452 Patent specification’s description of the invention confirms this:

- “The present invention provides systems and methods for peer-to-peer (P2P) dynamic networks and/or sub-networks for file distribution between peers receiving the same content.” Appx033, 4:28-31.
- “[E]mbodiments of the present invention include dynamic networks based upon a trace route or other dynamic network segmentation strategy, e.g., content delivery networks (CDN) internet protocol (IP) address.” Appx033,4:32-36.

#### 1. The Users’ Request for the Content Defines the Dynamic P2P Network.

The ’452 Patent’s system determines the content as the user requests the content. Appx033, 4:36-44. The common content to be consumed among the peers is determined automatically based on the trace route[1] between the peer and the peer’s request to the CDN identifying the requested content. Appx033, 3:52-55. “[E]mbodiments of the present invention include dynamic networks base[d] upon at least one trace route, e.g., CDN internet protocol (IP) addresses. Preferably, the present invention does not require any naming outside the IP addresses for peer nodes.” Appx033, 4:61-5:3. The claims require “at least one content request from a

[1] A trace route may provide internet protocol (IP) addresses. Appx033, 3:53-54.

client." Appx037, 11:12-13. Figure 1 shows the steps for at least one client or user to initiate communication and the server for the server to check content requests made by the client:




**Fig. 1**

Similarly, each claim requires that the dynamic network is defined by the trace route: "wherein the at least one P2P dynamic network is based on at least one trace route. .. ." Appx036, 10:36-37 (claim 1); Appx037, 11:6-7 (claim 5).

The specification teaches the first of two main requirements, that a content delivery server provides a common piece of content to peer nodes based singly on the client's request for the content:

> those peer nodes having content in common are identified and used for the distribution within that dynamic network; new peer nodes are added for common content with other peer nodes. Peer nodes or content

> recipients of the same content provide for redirected content delivery among peer nodes (or users), thereby by-passing any established or static content delivery network (CDN).

Appx035, 5:35-42; *accord* Appx035, 6:37-45. The specification continues to teach, the peers requesting common content should share only if they could do so efficiently:

> The content delivery server further identifies those peer nodes that are in close network proximity to each other and uses them to distribute content to each other to create more efficient content delivery thereby.

Appx035, 5:44-47. The '452 Patent confirms that "advantageously, this saves time, improves redundancy, and also reduces or eliminates costs for content delivery over the CDN for the peer nodes." Appx035, 5:42-44.

#### 2. Internet Connection Quality Defines the Dynamic P2P network.

In focusing on the quality of the dynamic P2P network, the '452 Patent provides specific factors for "balancing or managing" distribution, including "segmentation based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, other server side scheduling/resource allocation techniques, and combinations thereof." Appx034, 5:51-56; *see also* Appx034, 6:13-36. Similarly, each claim requires distribution of the content to be based on segmentation, requiring segmentation of the content as follows: "wherein content segmentation is based on CDN address resolution, trace route to CDN and

P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques." Appx036, 10:49-54 (claim 1); Appx037, 11:14-20 (claim 5); *see also* Appx034, 6:37-45.

### C. Implementation of the Claimed Invention

Figures 11-14 disclose grouping of peer nodes sharing content, and are explained in the specification. Appx034, 5:49-58; 6:46-7:14. Additionally, the metrics relied upon to determine the group are further explained:

> Methods of the present invention include a step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id. The automatic determination of group size for the P2P dynamic networks according to the present invention is important for performance and ability to manage issues to a single or multiplicity of clients in the group but balanced by a need to reduce system resources needed to keep connections to all group members.

Appx035; 7:14-28.

Figure 11 describes an exemplary case for registering a client or user. Appx028. From a register step, a profile of the client is provided (Profile Client), that includes content and subcomponents of the client's profile network, including location and bandwidth. The client is then added to Client Profiles and a Network Graph. Appx035, 8:42-50. Additionally, from the register step, the client may be added to a group for active content or to other such groups (Add Client to Content Item Groups). Appx035, 8:50-54. Finally, once the client is registered, it may

request list of available sources for streaming (Request Stream Source List)." Appx035, 8:54-56.

Figure 12 describes the steps for withdrawing a client from the network (Withdraw). The flow chart shows the steps to "Remove Client" from the "Client Profiles" and from the "Network Graph" and to "Remove Client from Content Items Groups." Appx029; Appx035, 8:58-67.

Figure 13 describes the "Request Stream Source List" function, which obtains clients and ranks them based on client profile information and client network information to submit a report. Appx030; Appx036, 9:1-8. Figure 14 further describes the "Submit Report" function, including the steps of updating the Q0S for stream source and client performance. Appx031; Appx036, 9:9-12.

## III. The Factual Allegations of CEI's Amended Complaint

CEI made specific allegations in its Amended Complaint that the asserted claims of the '452 Patent are patent eligible. Appx045, ¶ 9; *accord* Appx063, ¶ 9.

CEI also specifically plead facts about the inventive concept taken from the '452 Patent, specifically that:

- "'The prior art fails to provide video streaming over P2P networks outside the structure and control of [Content Delivery Networks] CDNs' (''452, col. 3:35-36)." Appx045, ¶ 10; accord Appx063, ¶ 10.
- "The novelty of '452 patent, the patentee argued to the U.S. Patent Office, was that the claims use means of testing [i.e., trace routes] to

further segment the actual content being delivered ....” Appx046, ¶ 11; accord Appx064, ¶ 11.

- The Patent Office recognized that the claims defined over the prior art in its Notice of Allowance based*, inter alia*, on the use of the trace route to segment requested content.. Appx046, ¶¶ 11, 12, accord Appx064, ¶¶ 11, 2.

CEI plead that the “[t]he ‘452 patent discusses some of the benefits of this novel technique,” and then quoted directly from the patent. Appx046, ¶ 13, quoting Appx034, 5:38-48; *accord* Appx064, ¶ 13. CEI further plead that the ’452 Patent “addresses capacity,” and “[t]he patent claims are addressed to the solution—sharing video content through a dynamic network. This dynamic network is defined by the peer nodes consuming the same content.” Appx049, ¶ 24; *accord* Appx067, ¶ 24. “If control is passed to the P2P dynamic network, then capacity may be substantially addressed—and in some cases exclusively addressed—by the P2P dynamic network. In other words, the computing capacity of the client devices consuming the video content is leveraged and used to the maximum extent, according to the ‘452 patent claims.” Appx049, ¶ 25; *accord* Appx067; ¶ 25.

CEI plead that the ‘[t]he ‘452 patent reverses the flow of the distribution of the shared content.” Appx047, ¶ 14, quoting Appx033, 4:52-60; *accord* Appx 065.

CEI plead specifically the limitations of claim 1. Appx047-48 ¶¶ 18-22; *accord* Appx065-67; ¶¶ 18-22.

Finally, CEI specifically plead that the inventors' "JoosyCloud is a system that embodies the claims of the '452 patent. That is the JoosyCloud source code practices the required elements of claims 1 and 5 of the '452 patent." Appx049, ¶ 23; *accord* Appx067, ¶ 23.

## SUMMARY OF THE ARGUMENT

The district court's decision exemplifies two cardinal sins in granting a Rule 12 Motion to Dismiss, each of which fatally infects its *Alice* analysis. First, the district court resolved inferences contrary to the non-movant, CEI. The district court failed to accept CEI's specific pleadings in its Amended Complaint (1) that the patent was presumed valid, (2) that the advantages plead and set forth in the specification were really advantages, (3) that claim 1 specifically claimed a dynamic P2P network based on a trace route, which was not abstract, (4) that the same specifically claimed P2P network contained an inventive concept, and (5) that the inventors' JoosyCloud system embodied the claims of the invention, exemplifying actual reduction to practice. Instead, the district court went out of its way to disregard these specific pleadings and to hold otherwise, based on broad generalizations substituting for the language of the '452 Patent claims and contrary to the Amended Complaint.

Second, the district court resolved disputed factual issues, that in-and-of-themselves should have prevented the grant of a Rule 12 motion. For example, the

court undertook the factually intensive task of determining whether the ’452 Patent specification adequately disclosed *how* the claims would be accomplished. Yet, that is a job for one of skill in the art. The district court ignored the allegations that the JoosyCloud system embodied the claims and was actual reduction to practice and hence, failing to explain why those allegations did not specifically cut against patent ineligibility. These errors fatally infected the court’s analysis under *Alice*.

In its *Alice* Step One analysis, the court’s use of broad generalizations as a proxy for the specific claim language, caused it to improperly the “focus of the ***’452 patent*** is the preparation and transmission of content to peers through a computer network.” Appx006 (emphasis added). Yet, *Alice* Step One requires the court to determine what the “***claims*** are directed to,” not broadly determine what the patent may be about. In contrast to these broad generalizations, the claims specifically teach “distribution of P2P content” over a “P2P dynamic network” that is “based on content segmentation” using “trace route to CDN and P2P server managers.” The claim language is much more specific than the district court’s broad proxy language. It is legal error to overly generalize the teaching of the patent claims, and especially to broaden the alleged teaching so much that it ignores the claim language all together. The asserted claims of the ’452 Patent satisfy *Alice* Step One and this case should be vacated.

Second, the district court's *Alice* Step Two analysis suffered equally from its untethered generalizations. By applying its overly broad proxy for claim language, the district court again failed to understand the specifically claimed inventive concept: improved dynamic P2P network created from segmenting content based on a trace route. In fact, the district court once again ignored factual allegations in the pleadings that confirmed satisfaction of *Alice* Step Two. As one example, CEI plead that the patent is presumed valid, but the court specified, contrary to *Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. 91 (2011) that it did not have to acknowledge the presumption of validity in granting a Rule 12 motion to dismiss. In addition, CEI explained that the Examiner's reason for allowance exhibited inventive concept, but the court disregarded that as well. Finally, disregarding consideration of the claim language as a whole, the district court excised one limitation from the claim language and improperly required that language to "solely" establish inventive concept. But the claims must be considered as a whole, and all inventions are made up of old concepts. It has to be that way, otherwise almost all patents would be invalid. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). For these reasons as well, the case should be remanded.

Finally, lacking jurisdiction, the district court held the entire '452 Patent invalid when only claims 1-3, and 5 were at issue in the pleadings. At the very least

the Court should instruct the district court to limit its decision to the claims that CEI placed at-issue in the complaint.

## ARGUMENT

### I. Standard of Review

This Court reviews a district court's Rule 12(b)(6) dismissal under regional circuit law, here the Ninth Circuit. *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016). Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). All factual allegations are assumed to be true, and all reasonable inference are drawn in favor of the non-moving party. *See e.g., Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

"We review the Rule 12(b)(6) dismissal de novo." *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015)." *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018). Patent eligibility under § 101 is a question of law, based on underlying factual findings. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018). It may be resolved on a Rule 12(b)(6) motion "when there are no factual allegations that, taken as true, prevent resolving the eligibility as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

## II. Contrary to the District Court Generalizations of the Specification, The Claim Language Satisfies *Alice* Step One

*Alice* Step One requires analysis of the patent's claims. *Alice Corp.*, 573 U.S. at 216; *see also Mentone Solutions LLC v. Digi Int'l, Inc.*, 21-1202, Slip Op. at 7 (Fed. Cir. Nov. 11, 2021) ("First, we determine whether the claims are directed to a "patent-ineligible concept," such as an abstract idea."). However, that is not what the district court did here. Instead, the district court based its determination that the '452 Patent failed *Alice* Step One using broad generalizations for the "focus" or "purpose" of the patent, not the claims: "***At step one, the Court broadly construes a patents purpose*** ...." Appx007 (emphasis added). The district court improperly determined that "[t]he focus of the '452 patent is the preparation and transmission of content to peers through a computer network. '452 patent at 4:28-65." Appx006. Not only was this legally improper under *Alice*, it was an incorrect statement of what the claims are "directed to." *See, e.g., Mentone*, Slip. Op. at 7.

### A. The District Court Failed to Determine That the Claims Were Specifically Directed to the Use of Trace Routes to Segment User Content Over a Dynamic P2P Network

Contrary to the district court's decision, a patent's general "focus" or "purpose" is not what its claims are "directed to" under *Alice* Step One. *See, e.g.*, *Visual Memory LLC v. NVIDIA Corp*, 867 F.3d 1253 (Fed. Cir. 2017) (considering the claim language when analyzing *Alice* Step One). After making its broad "focus" determination, the district court then jumped to the conclusion that the "preparation

and transmission of data over a computer network are abstract ideas that courts have consistent[ly] found to be patent-ineligible." Appx006 (citing case law). Again, the district court ignored the claims, which provide specificity, e.g., the use of the "trace route to segment requested content, find peers, and return client-block pairs," over a dynamic P2P network. Appx036, 10:44-45.

Instead, the court relied on this Court's decision in *WhiteServe LLC v. Dropbox, Inc.*, 19-2334 (Fed. Cir. Apr. 26, 2021) a non-precedential case, for the overbroad proposition that a patent is directed to an abstract idea because the specification relies on "ordinary storage and transmission capabilities," or "basic computer function" capabilities. Appx007. The district court then pronounced, without any support, that:

> Here, the '452 patent does no more than recite (1) the mere manipulation of data through segmenting, and (2) basic computer functions of storing, checking, requesting, and transmitting data. '452 patent at 10:42-45, 11:12-25.

Appx007 (citing three lines of claim 10 and 13 lines of claim 5). Yet, this determination is incorrect both legally and technically.

To support its overly broad proclamation, the district court erroneously equated the claims' segmentation requirement to data preparation. Appx006. Regardless of whether "segmentation" is "data preparation," the claims are not directed to merely segmentation, but rather to segmentation based on the trace route: "use the trace route to segment requested content . . . ." Appx036, 10:44-45. This

was the reason the patent office allowed the patent. The prior art used trace routes to test pathways in the network architecture for CDN's to push out content. Appx046, ¶ 11. CEI distinguished this prior art in the patent office, because the at-issue claims require the trace route to segment the requested content among peers, based on the trace route, resulting in a dynamic P2P network. *Id.* However, the district court's analysis glosses over the claim language entirely and thus erroneously misses the claims' specific teachings that distinguish these claims from the cases cited in support of the district court's step-one holding. Appx006.

#### 1. Reliance on Generalized Proxy Language Instead of Claim Language Is Improper

Reliance on its generalized proxy language, which is different and broader than the claim language, is an improper analysis under *Alice* Step One. *See, e.g.*, *Koninklijke KPN N.V. v. Gemalto M2M GMBH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) (In analyzing Step One the court held that "the claims sufficiently capture the inventors' asserted technical contribution to the prior art by reciting how the solution specifically improves [the prior art] . . . ."); *see also Mentone*, Slip Op. at 8.

In *Mentone*, the Court determined that a claim directed to "additional multislot configurations for certain classes of mobile stations using extended bandwidth allocation" satisfied *Alice* Step One because the claim was directed to a patent-eligible improvement to computer functionality. *Id.* The Court analogized the *Mentone* claims to those in *DDR Holdings,* determining that the asserted claim

improves the normal operation of the communication system itself to "overcome a problem specifically arising in the realm of computer networks." *Id.* at 9; quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

Here, similar to *Mentone*, claim 1 improves a computer network. The prior art pushed content from the CDN server to the P2P network, under the control of the CDN. Appx033, col. 3:35-36. The control exerted by the CDN ensured that the network would be static, as the network was defined by to whom the CDN server pushed content. Claim 1 flips the script, requiring that the "multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) ...." Appx036, col. 10:38-40. Rather than defining the network based on the CDN controlling the media and pushing the media out to the CDN's subscribers, claim 1 offers a dynamic network based on a common request for content and the quality of service by which the peers consume the same content, which is determined through the trace route. "[T]he at least one P2P dynamic network is based on at least one trace route . . . ." Appx036, col. 10:36-37. "[D]istribution . . . is based on content segmentation . . . server side scheduling/resource allocation techniques." Appx036, col. 10:46-54.

The specification lends context to how claim 1 is in fact a newer, better network. Building the network according to the client's request for content allows for gains in network capacity by adopting the capacity of the clients and suffers none

of the limitations of the old way of pushing content out to a static subscription base: "[T]he content distributed via the peer nodes of the present invention does *not* establish the 'peerness' . . . ." Appx034, 5:18-19 (emphasis added). Claim 1 defines the network as the client request and also how the common content will be shared among the peers: "Methods of the present invention include a step of determining grouping of clients having common content based on a variety of metrics . . . ." Appx035, col. 7:14-17.

The prosecution history also tells the same story. The patent owner argued that using the trace route to determine segmentation of the P2P network was novel. Appx046. This was the reason for allowance, *id.*, and is the difference from the prior art. Where the '452 Patent asks the at least one client what is requested—and uses the pathway between the client and the server (i.e., a trace route)—the prior art used traceroutes to test how easily the server could push content to the client, who was a subscriber to the server that provided the content. The '452 Patent shares content based on the request—leveraging all the clients who, dynamically, request the same content. Appx036, 9:48-54; Appx049, ¶ 25.

#### 2. Determining that the Claims Cover "Mere Manipulation of Data" Ignores the Import of the Claims and Improperly Resolves Inferences Contrary to the Non-Movant

By holding, that the '452 Patent claims a "mere manipulation of data," the district court ignored the specific claim limitations that require defining the P2P

network based on each peer requesting the same content and building the P2P network using server-side scheduling techniques to ensure the best network connection. Appx036, 10:42-54 (claim 1); Appx037, 11:12-20 (claim 5). The claims detail a new way of distributing content from the CDN through the dynamic P2P network using the trace route to implement segmentation based on specific characteristics of the peers in the network. Appx036, 10:42-54; 11:6-20.

The '452 Patent is data agnostic. The new system and method take the data as presented. Appx033, 4:36-44. The CDN had pushed the data to the P2P network. The '452 Patent reverses the flow of data. Appx047. The '452 Patent does not manipulate or change any data. Instead, the '452 Patent takes the data—in the same manner as the prior art—and shares the data in a new, decentralized way. The district court inaccurately characterized the claims as merely moving data around through segmentation, but this analysis overlooked the requirements of the claims and missed the direction of the claims—virtualized content sharing based on a trace route, not manipulation of the content.

## B. The District Court Ignored the '452 Patent's Advantages and Improperly Required Some "Special Technology"

### 1. The '452 Patent Explicitly Identifies Advantages Gained Through Increased Capacity, Among Others

The district court misunderstands the advantages of the claimed invention when it determines that "capacity" is not described in the specification "as a problem

that the purported invention is meant to overcome." Appx008. In the Amended Complaint, CEI uses the term "capacity" to describe the advantages gained using the claimed dynamic P2P network. Appx049, ¶ 25 ("The benefit of this 'bottom up' approach is manifold and generally directed to addressing the capacity problem. If control is passed to the P2P dynamic network, then capacity may be substantially addressed—and in some cases exclusively addressed—by the P2P dynamic network."); *accord* Appx067, ¶ 25.

While the district court is correct that the '452 Patent's description of capacity is with respect to the "individual devices receiving transmitted data," Appx008, it is incorrect in its ***assumption*** that the ability of those individual devices to receive data has no effect on the capacity of the network. *Id.* To the contrary, the specification is replete with discussion about off-loading data from the CDN to the P2P dynamic networks as plead by CEI, and as set forth in the Statement of the Case (SOC), II.A. *See also e.g.,* Appx045-47, ¶¶ 10-14; Appx048, ¶ 21; *accord* Appx063-065, ¶¶ 10-14; Appx066, ¶ 21.

At the very least, the district court's improper assumption about the capacity of the network results in an improper inference against the non-moving party. *Aatrix Software*, 882 F.3d at 1125 (restating that "factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.").

### 2. Contrary to the District Court, Patent Specifications Are Not Required to Disclose "Special Technology"

The district court's further improper conclusion that CEI "does not explain *how* the purported improvement [the problem of capacity] is accomplished, and neither does the patent," Appx008, simply misunderstands the specification and misapplies the law. Contrary to the district court's assertion, the '452 Patent specification walks through its algorithm in the specification and the figures. Claims 1 and 5 teach how to create the virtual layer. The claims stress the dynamic network based, not on what is pushed to the peer, but rather what the peer requests. Having passed the threshold of each peer consuming the same content, the claims teach how to use server-side techniques to render the best and most efficient dynamic network. *See*, SOC, II.C., *supra*.

The steps taught by the '452 Patent yields the virtual P2P layer:

> T]he systems and methods of the present invention, in particular as illustrated in the figures, and more particularly in FIGS. 11-14, include implementation for dynamic peer-to-peer (P2P) network-based, IP-based communication among peer nodes, wherein the peerness of the peer nodes is defined by their common content.

Appx034, col. 6:46-51. The specification details how to group the peers based on numerous server-side scheduling techniques. "Methods of the present invention include a step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id." Appx035, col. 7:14-18. Figures 2 through 9 detail the segmentation of a live stream

for synchronized viewing among the peer group. Figures 11 and 12, for example, show the rules by which clients register and withdraw from the peer group. Figure 10 shows a business process, covered by claim 15, that is, a way to reward consumers of the same content. The other figures teach other specific use cases. Appx018-031.

In addition, whether the '452 Patent adequately explains *how* its invention is accomplished is determined by one of skill in the art, rather than the lay district court judge. *See, e.g.*, *Ariad Pharm. Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (holding with respect to § 112 that "the specification must describe an invention understandable to a skilled artisan and show that the inventor actually invented the invention claimed," and concluding "[t]his inquiry, as we have long held, is a question of fact.") (internal citations omitted). Dismissal on the pleadings based on 35 U.S.C. § 101 is not the time to determine whether a patent specification adequately taught the invention to one of skill, and to do so, improperly resolves facts and inferences against the non-movant.

If, as the district court held, patent specifications were required to disclose "special technology beyond standard, generic computing equipment already disclosed in the prior art," Appx008, then the majority of computer-related patents would be invalid. *Alice Corp.*, 573 U.S. at 217 ("At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. . . . At some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature,

natural phenomena, or abstract ideas.'") (internal citations omitted). The district court's overly demanding standard for what it believes must be taught in the patent contradicts precedent, and certainly with the requirements of Rule 12.

### C. The District Court's Improper "Functional Language" Conclusion Also Ignores the Specifics of the Claim Language.

Finally, under its *Alice* Step One section, the district court improperly concludes that the claims "recite purely functional language and use conventional technology in a typical manner." Appx009. However, the court does not analyze the claim language. It paraphrases some of the claim language and then makes its broad conclusion. What the district court leaves out of its paraphrasing are the specific structural limitations throughout claim 1, including limitations that the Patent Office relied upon to allow the claims as well as limitations that were added in response to an Examiner interview:

> wherein the at least one content delivery server computer is operable to store viewer information, check content request, use the trace route to segment requested content, find peers, and return client-block pairs<u>;</u>
>
> <u>wherein distribution of P2P content delivery over the at least one P2P dynamic network is based on content segmentation;</u>
>
> <u>wherein content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques.</u>

Appx036, 10:42-54 (claim 1) (underlining showing added limitations); *accord* Appx251 (Draft Amendment to Claims, claim 1).

These specific and highly technical requirements set this case apart from the three precedents the lower court found supportive. In *Two-Way Media, Ltd. v. Comcast Commun'cn*, *LLC*, the claims went to the result without setting forth a way to get to the result: "Nor does the construction provide any parameters for the 'signals' purportedly dictating how the information is being routed." 874 F.3d 1329, 1338 (Fed. Cir. 2017). Here, the claims tell how to build the virtual layer, based on the request for content and the metrics, including trace route, of the dynamic network that has formed. Appx036, 10:25-54 (claim 1); Appx036, 10:62 – Appx037, 11:1-25 (claim 5).

In another case, the claims were directed to an idea but not an improvement: "The specification does not describe a new telephone, a new server, or a new physical combination of the two. The specification fails to provide any technical details for the tangible components, but instead predominately describes the system and methods in purely functional terms." *In re TLI Commc'ns*, 823 F.3d at 612 (Fed. Cir. 2016). Unlike *TLI*, each part of the intrinsic record tells one of ordinary skill in the art, inventively, to define the P2P network based on the client request for content and the metric of how the client will consume the content with and among its peers.

*See, e.g.*, Appx037, 11:12-13 ("receiving at least one content request from a client . . . ."); Appx035, 7:14-17; Appx047.

The third case with which the court supported its holding bears no resemblance to CEI. "Nothing in the flow chart or the text of the specification provides any details regarding the manner in which the invention accomplishes the recited functions." *Affinity Labs of Texas, LLC v., DIRECTV, LLC*, 838 F.3d 1253, 1260 (Fed. Cir. 2016). Here, by contrast, CEI pleads that the patent was allowed because CEI used a trace route differently. Appx045-046. More importantly, however, the claim language teaches—requires—that the artisan create the virtualized sharing of content based on who is requesting the content and how that client would share the content with another client consuming the same content at the same time. Appx036, 10:25-54 (claim 1); Appx036, 10:62 – Appx037, 11:1-25 (claim 5).

Because claims 1 and 5 are directed to an improved dynamic P2P network based on segmenting content on a trace route, as claimed, they satisfy *Alice* Step One. The district court erred holding otherwise, and this decision should be vacated and remanded.

### D. The Claim Limitations Specifically Require an Improved Dynamic P2P Network Based on Segmenting Content on a Trace Route.

The claim language specifically teaches a new P2P distribution network that operates outside the control of the legacy prior art CDN server. Claim 1 covers, "A system for virtualized computing peer-based content sharing . . . ." Appx036, 10:25-26). Claim 1 requires that one of skill to engineer two components to achieve this virtual system. First, the artisan must include in the system "one P2P dynamic network ... based on at least one trace route ...." Appx036, 10:36-37; *see also id.* 3:53-54 ("dynamic networks base[d] upon a trace route, e.g., CDN internet protocol (IP) addresses.").

Second, the claims specify that one of skill must "use the trace route to segment the requested content," Appx036, 10:44-45, based on several specifically claimed factors: "CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques." Appx036, 10:44-54; *see also id.*, 5:49-58 (teaching "factors for balancing or managing distribution of the P2P content delivery").

These two requirements yield the virtual layer. Additionally, method claim 5 includes a third specific requirement, that the virtual computing method: "automatically identif[ies] at least one peer node having at least one segment of the

requested content in close network proximity to the client . . . ." Appx011, 11:21-23; *see also id.*, 7:14-17 ("Methods of the present invention include a step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id.").

In the Amended Complaint, CEI asserted these at-issue claims are patent eligible because they specifically set forth this dynamic, improved P2P network. Appx047-049. The court legally erred by using generalized language to disregard these pleadings, which are taken directly from the patent claims. *See, e.g., Koninklijke*, 942 F.3d at 1151.

As an additional example, claim 13[2] requires grouping clients consuming the same content based on each client's quality of service—QoS. First, each client requests the same content from the CDN. Appx037, 11:12-13. Second, the clients are segmented based on the trace route—that is, the pathway between the client requesting the content and the CDN server. Appx037, 11:5-7; *see also* Appx033, 3:53-54. Third, the system identifies the peer group based on the CDN IP (routing table) for the segmented clients. Appx037, 11:14-20; *see also* Appx018, Fig. 1

[2] Although CEI did not assert claim 13 in its Amended Complaint, in response to arguments in Kollective's motion to dismiss, CEI it did explain how this dependent claim additionally shows that the asserted claims are not abstract.

9"Use trace route to segment"). Fourth, the system bases the grouping of the clients on the quality of service. Appx037, col. 12:22; *see also* Appx035, col. 7:14-17.

These '452 Patent claims set forth specific improvements to content sharing over dynamic P2P networks based on segmenting content on a trace route, and therefore align with the Court's line of cases holding improvement claims eligible under section 101. *See, e.g.*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) ("Accordingly, we find that the claims at issue in this appeal are not directed to an abstract idea within the meaning of *Alice*. Rather, they are directed to a specific improvement to the way computers operate, embodied in the self-referential table."); *accord Ancora Techs*, 908 F.3d at 1348 (improving security against an unauthorized use of a program held to be non-abstract).

For example, in *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017), the Court held that the "claims are directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame." *Id.* at 1348-49. And, in CEI, as the Amended Complaint alleges, the claims are directed to systems and methods that use dynamic P2P networks developed in a non-conventional manner through the information gained in a trace route to improve capacity in distribution of digital content, and allow sharing

between peers without static subscription to the CDN network. Appx046-049, ¶¶ 18-25.

Similarly to *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018), where a specific interface implementation for navigating complex three-dimensional spreadsheets was not abstract, 906 F.3d 1908-09, CEI's claims require use of the trace route to build the dynamic P2P network and then to distribute the segmented content among the peers.

In *Visual Memory*, the Court held that "the claims here are directed to a technological improvement: an enhanced computer memory system." *Id.* at 1259. "The '740 patent's claims focus on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor—instead of 'on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Id.* at 1259-60 (quoting *Enfish*, 822 F.3d at 1336). Such is the case for CEI where the claims are specifically directed to improving network capacity for transmitting digital content by providing a virtual, dynamic P2P network that develops based on information learned through the trace route of the CDN and the peers requesting access to common content. *See, e.g.*, Appx034 ("[W]herein the peerness of the peer nodes that initiates their cross-communication is based on common content that each is receiving from the server(s).").

Other cases provide similar guidance. *See, e.g., Uniloc USA, Inc. v. LG Elec. USA, Inc.*, 957 F.3d 1303, 1307-08 (Fed. Cir. 2020) ("In accordance with this precedent, we hold the claims at issue are directed to a patent-eligible improvement to computer functionality, namely the reduction of latency experienced by parked secondary stations in communication systems."); *CardioNet, LLC v InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) ("When read as a whole, and in light of the written description, we conclude that claim 1 of the '207 patent is directed to an improved cardiac monitoring device and not to an abstract idea."); *Koninklijke* , 942 F.3d at 1151 (Fed. Cir. 2019) ("[T]he appealed claims recite a sufficiently specific implementation (i.e., modifying the permutation applied to the original data 'in time') of an existing tool (i.e., check data generating device) that improves the functioning of the overall technological process of detecting systematic errors in data transmissions."); *Core Wireless Licensing S.A.R.L. v. LG Elec., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (claims "restrain the type of data that can be displayed . . . [and] recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices."); *Finjan, Inc. v. Blue Coat Sys, Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) ("Similarly, the method of claim 1 employs a new kind of file that enables a computer security system to do things it could not do before.... The asserted claims are therefore directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large.").

## III. The District Court Legally Erred Under *Alice* Step Two Because the Asserted Claims of the ’452 Patent Teach the Inventive Concept of Using Information from a Trace Route to Create a Dynamic P2P Network

### A. Contrary to the District Court’s Conclusion, a Patent is Presumed Valid and the Examiner is Presumed to Have Done Their Job

The district court disregards the ’452 Patent’s presumption of validity when it refuses to credit CEI’s pleadings that a duly issued patent considered valid and that the Patent Office examined the ’452 Patent application determining it to have novelty. Appx010-011. The district court cannot elect to make inferences contrary to the non-movant in a Rule 12 analysis. Yet, that is exactly what the district court did:

> While an issued patent is generally entitled to a presumption of validity, 35 U.S.C. § 282(a), the Court is not required to “assume the truth of legal conclusions merely because they are cast in the form of factual allegations. (case citations omitted).

Appx010-011. After making this proclamation, the district court fails to provide any reasoning for ***why*** it disregards the presumption of validity. That alone is reversible error. “Thus, by its express terms § 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense.” *Microsoft v. i4i*, 564 U.S. at 101 (specifically discussing obviousness and enablement); *accord CLS Bank Int’l v. Alice Corp. Pty.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013) (discussing patent eligibility), *aff’d Alice Corp. Pty. v. CLS Bank Int’l*, 573 U.S. 208 (2014) (“as with obviousness and enablement, that

presumption applies when § 101 is raised as a basis for invalidity in district court proceedings.") (citing cases); *but see Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (Mayer, J. concurring).

Instead, the district court proceeds to determine that the '452 Patent lacks inventive concept under *Alice* Step Two, by ***weighing*** the alleged merits of the pleadings, contrary to Rule 12. Appx011. The district court compares the pleadings to those in *Aatrix* and *BASCOM*, and determines that CEI's pleadings are "not similarly well-pled," because allegedly they "are not grounded in the patent specification or file history." Appx011. Yet, the district court provided no examples to support this determination, and its finding is demonstratively wrong. For example, in paragraphs 10 through 12 of the Amended Complaint, CEI alleges the prosecution history shows the inventive concepts specifically through the examiner's Reasons for Allowance: "The novelty of the '452 patent, the patentee argued to the U.S. Patent Office, was that the claims use these means of testing to further segment the actual content being delivered . . . ." Appx046. The Amended Complaint then specifically alleges the teachings of the specification and the key requirements of claims 1 and 13, showing the inventive concept. Appx046-049. CEI has consistently referred to the invention of the '452 Patent, whether at the patent office, at the district court, and now here, as involving dynamic P2P networks formed from a trace route.

Second, the district court improperly determined that the "amended complaint does not provide a description of the development of the patented invention, other than to describe the named inventors and original assignee of the patent." Appx011. Yet, that too is incorrect. Rather, the Amended Complaint alleges in an introduction that CEI's predecessor, Joosy, recognized the capacity and expense problem with sharing of digital content and "sought to improve the delivery of online video." Appx044. Joosy "created a product called JoosyCloud, which lowered the cost of online video delivery and improved the end-user experience." *Id.* As discussed, the amended complaint alleges the intrinsic record, including claims 1 and 13, taught the inventive concept and that the JoosyCloud source code embodies the patent claims. Appx046, ¶ 12; Appx049, ¶¶ 23-25.

At the very least, glossing over the paragraphs setting forth the contribution of the inventors of the '452 Patent impermissibly draws a negative inference that these contributions either were not worthy or were not related to the patent. Neither negative inference is proper under Rule 12. This is legal error under the Court's precedent. *See, e.g., Aatrix*, 882 F.3d at 1128 (holding that "[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact. And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").

Third, the district court referred to paragraph 13 of the Amended Complaint, which quoted from the specification's description of the benefits of the invention and held that this was "nothing more than improved efficiency, not an inventive concept." Appx012; Appx046, ¶ 13. Yet, the Amended Complaint is clear that the inventive concept is the use of "trace routes" to "perform content segmentation" over a dynamic P2P network. Appx046-049. The advantages of this inventive concept are also set forth in the '452 Patent specification in vastly more detail than the district court's hand wave. *See, e.g.,* Appx036, 9:41-10:13, *see also* SOC, II.A.; Appx046-49, including paragraph 25 ("When the network is defined by the content being consumed by the P2P network . . . the P2P network is decentralized and offloaded the general network."). It is not the district court's role to disagree with the pleadings on a Rule 12 motion. *See Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1364 (Fed. Cir. 2013) ("A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").

### B. The District Court Improperly Required the Claims To "*Solely* Rely on Trace Routes" to Establish Inventive Concept

The district court improperly required the specification and the independent claims to "rely ***solely*** on trace routes to accomplish the purpose of transmitting and delivering segmented content among peers." Appx013 (italics in original). This was

despite the Amended Pleadings specific allegations that the use of trace routes in combination with other elements defined over the prior art. Appx045-046, ¶¶ 10-12. The court's ***solely*** requirement to satisfy *Alice* Step Two improperly disregards the fact that all inventions are combinations of prior art. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012) ("[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made") (citing *Diamond v. Diehr*, 450 U.S. 175 (1981)).

In fact, the district court's own citations to support its misplaced "solely" proposition show that the claim, when considered as a whole provides an inventive step. Appx013-014. For example, the district court cites to the "trace route" limitations in claims 1 and 5, which include "segmentation" and "dynamic feedback" from peers in the "P2P network." Appx013. Those are the very same limitations that CEI alleges in its Amended Complaint to support its invention. Appx048-049. In addition, the district court cites to the prosecution history where the Examiner notes specifically that it is the combination of many different specific structures that make the claims non-obvious:

> Prior arts of record, failed to disclose or suggest that the multiplicity of peer notes of the dynamic peer-to-peer network consume the same content within a predetermined time and that the distribution of P2P content delivery is based on content segmentation and the content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic

> rates between individual peer and its neighbors round-robin, and other server side scheduling resource allocation techniques.

Appx014; Appx046, ¶ 12. However, the district court never applies the cited claim limitations or the reference to the prosecution history. Instead, the district court takes issue with the way CEI has described the inventive concept, determining, incorrectly, that CEI's description is contrary to a small snippet of the specification: "*Compare* Dkt. No. 20 at 13-14 *with* '452 patent at 5:38-48." Appx014. Yet, a Rule 12 motion is not the time to weigh comparisons of technology descriptions. Instead, taking all inferences in favor of the non-movant, Rule 12 is based on whether the Amended Complaint sets forth a claim upon which relief could be granted. *Aatrix,* 882 F.3d. at 1128. Clearly that was the case here.

### C. The District Court Improperly Applied § 112 to the Specification, Even Though the Rule 12 Motion Was on § 101

The district court went further to determine, on its own, without any expert support, that the '452 Patent does not explain "how the content delivery server computer or a peer node would recognize the other peer nodes are consuming the same content." Appx014. However, "compliance with the 'written description' requirement of § 112 is a question of fact, to be reviewed under the clearly erroneous standard." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). In addition, the determination under § 112 is based on what one of ordinary skill in the art would understand. The district court did not determine who one of ordinary skill

would be. Hence, whether the ’452 Patent teaches one of skill ***how*** is hardly something for the district court to resolve on its own in determining a Rule 12 motion to dismiss.

Similarly, the district court improperly resolved without expert support that one of skill would not understand how “the content delivery server computer or a peer node transmitting data would recognize other nodes in close network proximity.” Appx015. After citing to the specification for this determination, the district court then holds, without support that “such results-based claims using only conventional technology do not render claims patent-eligible.” *Id.* But the court does not refer to the claims to support its “results-based claims” conclusion. And, that conclusion is in direct contrast to CEI’s assertions in its Amended Complaint. However, as shown *supra*, CEI asserted that the claims on their face were (1) not results based or functional based, and (2) used a novel combination of technology to achieve an improved dynamic P2P network based on segmenting content on a trace route. *See* SOC, III, *supra*; *see also* Appx047 (“The ‘452 patent claims all require segmenting the digital content according to the trace routes. (‘452, FIGS. 2-9 and accompanying disclosure at col. 8:6-32 ....”). Under Rule 12 the district court legally erred by resolving what one of skill in the art would understand from the specification and ignoring that the claims as a whole provided a novel and inventive combination of elements. *See, e.g., Dow Chem. Co. v. Nova Chem. Co. (Canada)*,

809 F.3d 1223, 1225 (Fed. Cir. 2015) (a "question about the state of the knowledge of a skilled artisan is a question of fact."). Therefore, the claims satisfy *Alice* Step Two, and the district court's decision should be vacated.

### D. The District Court Missed the Inventive Concept Because It Failed to Appreciate the Claims' Engineering Requirements.

The '452 patent discusses the benefits of the new dynamic networks resulting from users consuming the same content. *See, e.g.*, App035, 9:41-63. The patent uses the term "leverage" to describe taking advantage of devices consuming the same content. *Id.* The amended complaint uses the term "capacity," to allege that the solution offered by these patent claims is taking advantage of the computing capacity of devices requesting the same content. Appx049, ¶¶ 24, 25.

Although district court focused on the word "capacity," it failed to appreciate how that word applies to the technology, improperly reasoning that the computing capacity of the individual peers was inapposite: "capacity of the individual devices receiving transmitted data, not the capacity of the network." *Id.* Yet, this is the exact benefit that the '452 Patent proclaims, allowing parallel computing using the capacity of a wholly dynamic and variable set of computers accessing the same content. App036, 9:41-63. Similarly, the court refers to "the network," which shows that the court misunderstood the dynamic, virtual layer that the claims teach how to build. This is not the CDN server pushing data out to the static P2P network; to be

sure, the '452 patent catalogues this prior art in columns one through three. Appx032-033. Instead, the at-issue claims offer a virtual, dynamic network, which could, for example, come to being when many devices request the same football game, such as the Bear v. Packer game. Then, this dynamic network disappears once the game is complete. Lost on the district court, these claims use the variable and at times surging, request for the same content as the basis for a new computing platform.

Computing, in all events, comes down to scarce resources and, yes, capacity. The district court interpreted the term "capacity" without considering the invention as a whole. However, that advantage of increased capacity was also an allegation in the pleading, not required to be a specific claim limitation. *Uniloc USA, Inc. v. LG Elec. USA, Inc.*, 957 F.3d 1303 (Fed. Cir. 2020) ("Claims need not articulate the advantages of the claimed combinations to be eligible.") Similarly to *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019), where the patentee made "specific, plausible factual allegations about why aspects of its claimed invention were not conventional, .... The district court erred by not accepting those allegations as true." *Id.*, 927 F.3d 1317-18. Here, CEI specifically alleged the claims inventive concept: use of a trace route to determine segmentation of data and develop a dynamic P2P network. Appx046, ¶12; App047-049, ¶¶ 18-25.

## IV. Under Ninth Circuit Law, the Factual Allegations in the Amended Complaint Preclude Rule 12 Dismissal Under

By glossing over the details of the Amended Complaint, the district court failed to recognize the specific facts CEI pled in support of its patent infringement theory. *See, e.g., Navarro*, 250 F.3d at 732. Although the district court recited the proper procedural standard, Appx003-004, the court only referred to the Amended Complaint deep in its analysis *Alice* Step 2, when distinguishing case law. *See* Appx011-012. And those references did not accurately depict what CEI plead. Had the court accepted, as Rule 12 directs it to do, the pleadings of CEI's amended complaint, instead of resolving its own technology questions adversely to the non-movant, CEI would not be on appeal today.

The Amended Complaint alleges the reason for allowance, a novel, non-obvious use of trace routes. Appx045-046, ¶¶ 10-12, *see* SOC, III, *supra*. However, the district court gave that fact no weight, which in and of itself is reversible error. *See, e.g., Cellspin*, 927 F.3d at 1317-18 ("The district court thus further erred by ignoring the principle, implicit in *Berkheimer* and explicit in *Aatrix*, that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101."). Indeed, "where all factual inferences drawn from the specification must be weighed in favor of ... the patent owner ..., the non-moving party," the district court commits reversible error when it does

otherwise. *Visual Memory*, 867 F.3d at 1261-62. The Court should vacate the district court's decision holding the '452 Patent ineligible.

## V. The District Court Legally Erred by Invalidating the Entire '452 Patent, Even Though it Only Analyzed Claims 1 and 5

The district court held that the "'452 patent is invalid under § 101." Appx015. Yet, as the district court also recognizes, CEI only asserted claims 1-3 and 5 in the Amended Complaint. Appx003; Appx050-059. The district court never discusses any dependent claims. Yet, "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of the other claims." 35 U.S.C. 282(a). And, when analyzing claims for validity, "[b]ecause dependent claims contain additional limitations, they cannot be presumed to be invalid ... just because the independent claims from which they depend have been properly so found." *Sandt Tech, Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001) (vacating district court's holding of dependent claims invalid under § 103 because court did not separately address those claims). Because the district court provided no analysis on dependent claims 2 and 3 (much less the other dependent claims), the district court failed to meet its burden of proving patent ineligibility of these dependent claims, and that determination should be vacated.

Additionally, there was no case or controversy with respect to the unasserted claims (4, 6-15) at the time Kollective filed its Motion to Dismiss. Therefore, the district court did not have jurisdiction over the unasserted claims and the Court should vacate that ruling as well. *See, e.g., Fox Grp., Inc. v. Cree, Inc*. 700 F.3d 1300, 1308 (Fed. Cir. 2012) (vacating the district court's finding that the entire patent was invalid where it was clear which claims were at issue and the district court therefore lacked jurisdiction on those that were not at issue); *see also Streck, Inc. v. Res. Diagnostic Sys., Inc.*, 665 F.3d 1269, 1284 (Fed. Cir. 2012) (affirming district court decision not to address claims that were not at issue based on lack of jurisdiction).

The Court should reverse the district court's holding that the entire patent fails § 101. At the very least, the Court should reverse the district court's holding on dependent claims 2 and 3, which were not discussed in the district court's opinion, and the Court should vacate the patent ineligibility decision that covers non-asserted claims 4, and 6-15 because the district court lacked jurisdiction to rule on those claims.

## CONCLUSION

CEI requests the Court reverse the district court's Rule 12 decision that the '452 Patent is invalid as not patent eligible. The claims teach an improved dynamic P2P network using trace routes to segment content. At the very least, the Court should reverse the district court's overbroad ruling that covers the entire '452 Patent rather than just the analyzed and asserted claims.

Date: November 19, 2021

*/s/ Meredith Martin Addy*
Meredith Martin Addy
**ADDYHART P.C.**
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
312.320.4200
meredith@addyhart.com

Benjamin M. Cappel
**ADDYHART P.C.**
401 N Michigan Ave, Suite 1200-1
Chicago, Illinois 60611
732.991.7285
benjamin@addyhart.com

Matthew M. Wawrzyn
**WAWRZYN LLC**
200 Randolph Street, Suite 5100
Chicago, IL 60601
(312) 235-3120
matt@wawrzynlaw.com

*Counsel for Plaintiff-Appellant*
*Cooperative Entertainment Inc.*

## PROOF OF SERVICE

I hereby certify that on November 19, 2021, an electronic copy of the foregoing Opening Brief of Plaintiff-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system and thereby causing a "Notice of Electronic Filing" to be served on all counsel of record.

Date: November 19, 2021

*/s/ Matthew M. Wawrzyn*
*Counsel for Plaintiff-Appellant*

## ADDENDUM

District Court Order Granting Motion to Dismiss............................ Appx001

District Court Final Judgment ......................................................... Appx016

U.S. Patent No. 9,4332,452 ............................................................ Appx017

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| COOPERATIVE ENTERTAINMENT, INC.,<br>Plaintiff,<br>v.<br>KOLLECTIVE TECHNOLOGY, INC.,<br>Defendant. | Case No. 5:20-cv-07273-EJD<br>**ORDER GRANTING MOTION TO DISMISS**<br>Re: Dkt. No. 19 |

Plaintiff Cooperative Entertainment, Inc. ("CEI") brings this suit against defendant Kollective Technology, Inc. ("Kollective") for infringement of U.S. Patent No. 9,432,452 ("the '452 patent"). Dkt. No. 18. Kollective now moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C § 101. Dkt. No. 19. The Court finds this motion suitable for consideration without oral argument. Civ. L.R. 7-1(b). Having considered the parties' moving papers, the Court GRANTS CEI's motion to dismiss.

## I. BACKGROUND

Plaintiff CEI is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Dkt. No. 18 ¶ 1. Defendant Kollective is a Delaware corporation with its principal place of business in Bend, Oregon. *Id.* ¶ 2.

CEI is the owner of the '452 patent, entitled "Systems and Methods for Dynamic Networked Peer-to-Peer Content Distribution." *Id.* ¶ 8, Ex. B. The '452 patent relates to "[p]eer-to-peer (P2P) dynamic networks and/or sub-networks for file distribution between peers receiving the same content, wherein nodes are outside controlled networks and/or content distribution networks (CDNs), and wherein large data files are distributed or shared across and among the peer

nodes." '452 patent at Abstract. In particular, the '452 patent concerns sharing the same content across peers in the P2P network outside the confines of a CDN. *Id.* at 3:40-64; *see also id.* at 5:4-10 ("Preferably, the systems and methods of the present invention provide for dynamic P2P networks distributing digital content in real-time or near-real-time to a multiplicity of peer nodes within the network, wherein the peer nodes are established and/or defined based upon their consumption of the same content, i.e., the peer nodes are receiving the same content.").

The '452 patent includes two independent claims, claims 1 and 5, from which all other claims depend. Claim 1 claims:

> 1. A system for virtualized computing peer-based content sharing comprising:
>
> at least one content delivery server computer constructed and configured for electrical connection and communication via at least one communications network; and
>
> at least one peer-to-peer (P2P) dynamic network including a multiplicity of peer nodes, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the multiplicity of peer nodes are constructed and configured for electronic communication over the at least one P2P dynamic
>
> network, wherein the at least one P2P dynamic network is based on at least one trace route; wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;
>
> wherein the at least one content delivery server computer is operable to store viewer information, check content request, use the trace route to segment requested content, find peers, and return client-block pairs;
>
> wherein distribution of P2P content delivery over the at least one P2P dynamic network is based on content segmentation;
>
> wherein content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques.

*Id.* at claim 1. Claim 5 is a method claim that recites:

> 5. A method for virtualized computing peer-based content sharing

United States District Court
Northern District of California

> comprising the steps of:
>
> providing at least one content delivery server computer constructed and configured for electrical connection and communication via at least one communications network;
>
> providing at least one peer-to-peer (P2P) dynamic network including a multiplicity of peer nodes constructed and configured for electronic communication over the at least one P2P dynamic network, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the at least one P2P dynamic network is based on at least one trace route, wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;
>
> the at least one content delivery server computer receiving at least one content request from a client;
>
> the at least one content delivery server computer segmenting requested content based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques;
>
> automatically identifying at least one peer node having at least one segment of the requested content in close network proximity to the client; and
>
> at least one peer node most proximal to the client sharing the at least one segment of the requested content.

*Id.* at claim 5.

CEI asserts that, when used in conjunction with Microsoft Teams software, Kollective's SD ECDN product infringes claims 1, 2, 3, and 5. Dkt. No. 18 ¶¶ 26-41.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of claims alleged in the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). To survive a Rule 12(b)(6) motion, the plaintiff must allege facts sufficient to state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Additionally, to state a claim for patent infringement, "a patentee need only plead facts sufficient to place the alleged infringer on notice. This requirement ensures that the accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself." *Internet Patents Corp. v. Gen. Auto. Ins. Servs.*, 29 F. Supp. 3d 1264, 1267 (N.D. Cal. 2013) (quoting *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000)). A court generally may not consider any material beyond the pleadings for a Rule 12(b)(6) analysis; however, documents appended to the complaint, incorporated by reference in the complaint, or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

**B. 35 U.S.C § 101**

Section 101 of the Patent Act provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, the Supreme Court has recognized that these broad categories contain an implicit exception: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (internal quotation marks and citation omitted). In applying this exception, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

To determine whether a claim falls within the "abstract idea" exception, the Supreme Court has established a two-step framework. First, the court must "determine whether the claims at issue

are directed to a patent-ineligible concept." *Id.* at 2355. Second, if the claims are directed to patent-ineligible subject matter, the Court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012)). The Supreme Court has described this as a "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.*

## III. DISCUSSION

CEI argues that the Court should dismiss the amended complaint for two reasons: (1) the '452 patent is invalid under § 101, and (2) the complaint fails to plausibly plead patent infringement because it does not adequately allege that CEI's accused SD ECDN product practices each and every limitation of the asserted claims. The Court begins with the § 101 analysis.

### A. *Alice* Step One

At step one of the *Alice* framework, the Court "look[s] at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). Courts must be careful not to overgeneralize claims otherwise "all inventions can be reduced to underlying principles of nature." *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981). On the other hand, the judicial inquiry should root out "creative drafting efforts" designed to "monopolize" the abstract idea. *See Alice*, 573 U.S. at 221. "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). Merely stating an "improved result" to an otherwise abstract idea is insufficient; the patent must recite a "specific means or method that solves a problem in an existing technological process."

*Koninkliijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019). Accordingly, the relevant inquiry is what problem the patent claims to solve and whether the patent specifically asserts a method to make improvements.

The focus of the '452 patent is the preparation and transmission of content to peers through a computer network. '452 patent at 4:28-65. The preparation of data consists of segmentation. *Id.* The transmitted content may include photos, video, game and social media content, and large data files in general. *Id.* at 4:36-40, 4:50-52, 9:23-40. The specification also describes storing data and database processing. *Id.* at 9:30-33 ("Additionally, it is possible to use peer nodes for distributed storage as well as additional (game-based/social network) database processing."). According to the specification, the '452 patent "provide[s] more efficient and reduced cost of delivery for the content" transmitted through the P2P network, as well as "increased reliability, more redundancy, and more efficient delivery than those of the prior art." '452 patent at 4:49-50, 5:28-30. CEI sums up the '452 patent as "a better way of content sharing." Dkt. No. 20 at 12.

The preparation and transmission of data over a computer network are abstract ideas that courts have consistent found to be patent-ineligible. "[C]ourts have previously found that patents involving the transformation and transmission of information in one form or another form constituted abstract ideas." *Easyweb Innovations, LLC v. Twitter, Inc.*, No. 11-cv-4550-JFB-SIL, 2016 WL 1253674, at *28 (E.D.N.Y. Mar. 30, 2016) (listing cases); *see also Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1329 (Fed. Cir. 2017) ("sending and receiving information" over a network are "routine computer functions"); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (finding the receipt of e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization (i.e., filtering files/e-mail) to be abstract ideas); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (finding that "receiv[ing] and send[ing] the information over a network" is generic); *VideoShare, LLC v. Google, Inc.*, No. 13-cv-990 (GMS), 2016 WL 4137524 (D. Del. Aug. 2, 2016) (finding invalid under § 101 patent claims directed to preparing a video in streaming video format for sharing over a computer network), *aff'd* 695 F. App'x 577

(Fed. Cir. 2017). Recently, the Federal Circuit affirmed the invalidation of a patent claiming a system for backing up data by requesting, transmitting, receiving, copying, deleting, and storing records. *WhitServe LLC v. Dropbox, Inc.*, --- F. App'x ---, 2021 WL 1608941 (Fed. Cir. 2021). In *WhitServe*, the Federal Circuit found that the patent was directed to an abstract idea because the "specification [did] not . . . explain the technological processes underlying the purported technological improvement" but "rel[ied] on the ordinary storage and transmission capabilities of computers within a network and apply that ordinary functionality in the particular context of onsite backup." *Id.* at *4 (internal quotation marks omitted). "[C]laims reciting computer function, or the mere manipulation of data, are directed to an abstract idea." *Id.* Here, the '452 patent does no more than recite (1) the mere manipulation of data through segmenting, and (2) the basic computer functions of storing, checking, requesting, and transmitting data. '452 patent at 10:42-45, 11:12-25. If all generic computer-implemented steps were stripped from the asserted claims, all that would be left would be the transmission of segmented portions of information between peers, which a human could easily perform—for example, students providing each other with photocopied chapters of a textbook instead of each student obtaining the textbook from the bookstore. *See Symantec*, 838 F.3d at 1318 (holding that claims were directed to an abstract concept because, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper").

At step one, the Court broadly construes a patent's purpose and asks what problem the patent seeks to resolve. CEI asserts that claims 1 and 5 are "directed to a specific way that improves the legacy P2P networks," but its arguments appear to be directed more to whether the patent contains an inventive concept. *See* Dkt. No. 20 at 11, 13 ("[T]he patentee took an existing tool—trace[ ]routes used to test the pathway between and among nodes—and used that existing tool to make something new" by using trace routes to "perform the content segmentation"; "the patentee taught those of ordinary skill in the art how to manipulate the prior art systems in a new, unexpected way . . . ."). The '452 patent does not otherwise identify any particular shortcoming

that it is intended to address. CEI suggests—without any supporting evidence—that the '452 patent claims solve an unspecified "problem of capacity where the prior art P2P systems had failed." Dkt. No. 20 at 3, 9. However, "capacity" is not described anywhere in the specification as a problem that the purported invention is meant to overcome. "Capacity" is mentioned exactly twice in the specification: once in describing a prior art patent, and once in describing aggregate use of the collective peer nodes. '452 patent at 3:17-28 (describing patent for "method for streaming multimedia content" that "advantageously offload[s]" tasks preparatory to streaming "to the client side and distributed among [user multimedia devices], to realize reduced bandwidth and delay and to conserve on storage capacity of a UMD"); *id.* at 9:54-63 ("The systems and methods of the present invention provide for harnessing the content recipient devices to aggregate or assemble intelligent functionality of the devices unassociated with the content receipt, including but not limited to computational storage and processing capacity of the content recipient devices in the P2P dynamic network . . . ."). The latter reference concerns the capacity of the individual devices receiving transmitted data, not the capacity of the network.

Even if CEI were correct in that the '452 patent "improves the legacy P2P networks" by solving a "problem of capacity," CEI does not explain *how* this purported improvement is accomplished, and neither does the patent. The patent does not disclose any algorithm or special programming or any special technology beyond standard, generic computing equipment already disclosed in prior art. *See* '452 patent at 1:17-20 ("Generally, it is known in the relevant prior art to provide peer-to-peer (P2P) networks via the internet for sharing digital content, including video, for live streaming service over content distribution networks (CDNs)."); *id.* at 5:11-14 ("the embodiments of the present invention described herein assume the use of existing audio and/or video playback"); *id.* at 5:59-67 ("[T]he systems and methods of the present invention may be integrated with applications (Apps) for mobile devices, including but no limited to smart phones, tablet computers, mobile computers, mobile communication devices, and the like, and combinations thereof. However, no customized or proprietary software download to the peer node content recipient devices is required for the systems and methods of the present invention."). In

terms of computer equipment, claims 1 and 5 require nothing more than a "content delivery server computer constructed and configured for electrical connection and communication via at least one communications network" and a P2P "dynamic network including a multiplicity of peer nodes construed and configured for electronic communication" over the network. *Id.* at 10:27-31, 10:64–11:4. CEI does not appear to dispute that the content delivery server computer could be any computer capable of performing the above functions, or that the peer nodes could be any computer or device connected to a P2P network.

Furthermore, Claims 1 and 5 merely use results-based functional language: claim 1 claims a system with a server computer capable of performing basic computing functions (storing data, checking data, preparing or segmenting data, identifying peer nodes, and delivering content) and a P2P network with peer nodes that consume common content within a predetermined time. Claim 5 parrots claim 1's system in method form, with the additional step of automatically identifying a peer node in close proximity to the client, which shares at least one segment of the requested data with the client. When claims recite purely functional language and use conventional technology in a typical manner, the claims are not patent eligible. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (holding that claim is directed to an abstract concept at step one because it "recites a method for routing information using result-based functional language," such as "converting," "routing," "controlling," "monitoring," and "accumulating records," but it "does not sufficiently describe how to achieve these results in a non-abstract way"); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (finding claims abstract where the "specification fails to provide any technical details for the tangible components" and "instead predominately describes the system and methods in purely functional terms"); *Affinity Labs*, 838 F.3d at 1257 (holding that claim is abstract at step one because "it claims the general concept of out-of-region delivery of broadcast content through the use of conventional devices, without offering any technological means of effecting that concept").

CEI does not address the Federal Circuit case law cited above or in Kollective's motion. Because the patent merely states an improved result to an abstract idea without reciting a "specific

means or method that solves a problem in an existing technological process," *Koninkliijke*, 942 F.3d at 1150, the claims are not patent eligible. Accordingly, the Court concludes at step one of the *Alice* framework that the claims of the '452 patent are directed to an abstract idea.

**B. *Alice* Step Two**

At step two, the Court examines the elements of the claims, both individually and "as an ordered combination" to determine if they contain an "inventive step" sufficient to "transform" the claimed abstract idea into a patent-eligible application. *Alice*, 573 U.S. at 221 (citing *Mayo*, 556 U.S. at 78–79). Step two is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (quoting *Alice*, 573 U.S. at 225); *see also TLI Commc'ns*, 823 F.3d at 613 ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea."). "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018). After identifying an ineligible concept at step one, the Court asks at step two: "What else is there in the claims?" *Mayo*, 566 U.S. at 78.

CEI first asserts that the '452 patent's inventive concept is the "use [of] trace[ ]routes to identify common content that will be consumed by the peers and then segmenting and distributing the content based on the trace[ ]route." Dkt. No. 20 at 12. Elsewhere in its opposition brief, CEI describes the purported inventive concept as "segmenting content in a virtual P2P network using the tools of the CDN on the backend." *Id.* at 14; *see also id.* at 15 (citing paragraphs 12 and 13 of the complaint for the assertion that "the amended complaint specifically alleges that the '452 patent discloses an 'inventive concept' that was recognized and subsequently upheld by the U.S. PTO"). CEI argues that the patent examiner's finding that this purported inventive concept was lacking in the prior art is "presumed correct" and because CEI so pled in its complaint, that allegation "should be accepted by the Court as true at the pleading stage." *Id.* at 12. While an

issued patent is generally entitled to a presumption of validity, 35 U.S.C. § 282(a), the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.") (internal quotation marks omitted); *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1332 (Fed. Cir. 2012). Courts can and do regularly assess a patent's validity under § 101 at the pleading stage. *See, e.g.*, *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").

CEI relies principally on two Federal Circuit cases in support of its argument that it adequately alleges in its amended complaint that the '452 patent discloses an inventive concept: *Aatrix Software, Inc. v. Green Shades Software*, 882 F.3d 1121 (Fed. Cir. 2018), and *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). Dkt. No. 20 at 14–15. Both cases are distinguishable. In *Aatrix*, the Federal Circuit held that the district court erred in determining that the disputed claim of the patent-in-suit was ineligible solely because it was directed to an intangible embodiment. The Federal Circuit further held that "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Id.* at 1126–27. Aatrix's complaint included numerous allegations related to the inventive concepts in the claimed technology, including a description of "the development of the patented invention," "the problems present in prior art," and "specific allegations directed to 'improvements and problems solved by the Aatrix patented inventions.'" *Id.* at 1127. In contrast, CEI's allegations do not contain a comparable level of detail and are not similarly well-pled, as they are not grounded in the patent specification or file history. The amended complaint does not provide a description of the development of the patented invention, other than to describe the named inventors and original assignee of the patent. Dkt. No. 18 at 2. The amended complaint identifies "capacity" as a problem in P2P network sharing, *id.* at 2 and ¶ 24, but as discussed

above, the patent itself does not identify any problem it is intended to solve, much less the problem of capacity. *See supra* Section III.A. Finally, paragraph 13 of the complaint refers to the benefits of the purported invention, which consists of "sav[ing] time, improv[ing] redundancy, and also reduc[ing] or eliminat[ing] costs," as well as "creat[ing] more efficient content delivery . . . ." Dkt. No. 18 ¶ 13 (quoting '452 patent at 5:38-48). These benefits amount to nothing more than improved efficiency, not an inventive concept. "An improved result, without more stated in the claim, is not enough to confer eligibility to an otherwise abstract idea." *Koninkliijke*, 942 F.3d at 1150.

Nor is this situation comparable to *BASCOM*, where the Federal Circuit held that the patent-in-suit directed to filtering content on the Internet was not ineligible under § 101 because it claimed "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems." 827 F.3d at 1351. As discussed above, the '452 patent does not disclose any particular problem that it is intended to solve, and it merely implements the abstract idea of preparing and transmitting data over a computer network with generic computer components using conventional technology. *See Erie Indem. Co.*, 850 F.3d at 1329 ("sending and receiving information" over a network are "routine computer functions"); *Alacritech, Inc. v. Intel Corp.*, 817 F. App'x 995 (Fed. Cir. 2020) (discussing patentability of patents issued in 2007, 2008, and 2010 that concerned dividing data in segments for transmission, and describing prior art from 1981 teaching a TCP protocol that segmented data into separate packets for transmission). As the *BASCOM* court noted, claims like claims 1 and 5 of the '452 patent that "merely recite the abstract idea . . . along with the requirement to perform it on . . . a set of generic computer components" do not contain an inventive concept. *Id.* 1350. "An inventive concept . . . cannot simply be an instruction to implement or apply the abstract idea on a computer." *Id.* at 1349.

CEI's arguments concerning novelty are not persuasive, as novelty does not necessarily transform an abstract idea into a patentable one. *See, e.g.*, *SAP Am., Inc. v. InvestPic, LLC*, 898

F.3d 1161, 1163 (Fed. Cir. 2018) ("We may assume that the techniques claimed are groundbreaking, innovative, or even brilliant, but that is not enough for eligibility."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("We do not agree . . . that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete."). As for CEI's argument that "the patentee took an existing tool—trace[ ]routes used to test the pathway between and among nodes—and used that existing tool to make something new" by using trace routes to "perform the content segmentation," Dkt. No. 20 at 13, that contention is inconsistent with the plain language of the patent itself. Neither the specification nor the independent claims rely *solely* on trace routes to accomplish the purpose of transmitting and delivering segmented content among peers. '452 patent at 5:49-56 ("Factors for balancing or managing distribution of the P2P content delivery over dynamic networks associated with the present invention include segmentation based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, other server side scheduling/resource allocation techniques, and combinations thereof."); *id.* at claim 1 (claiming distribution of P2P content delivery based on content segmentation, "wherein content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques"); *id.* at claim 5 (claiming "at least one content delivery server computer segmenting requested content based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques"); *see also* Dkt. No. 20-1 at ECF p.1 (allowing the '452 patent to issue over a rejection under 35 U.S.C. § 103 because "the prior arts of record, failed to disclose or suggest that the multiplicity of peer nodes of the dynamic peer-to-peer network consume the same content within a predetermined time and that the distribution of P2P content delivery is based on content segmentation and the content segmentation is based on CDN address resolution, trace route to

CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques")[1]. CEI's assertion that "the patentee taught those of ordinary skill in the art how to manipulate the prior art systems in a new, unexpected way: using the means of testing the pathways instead as a means to distribute data in a virtual network outside the control of the CDN" is not supported by the portion of the specification CEI cites for that proposition, which says nothing at all about trace routes. *Compare* Dkt. No. 20 at 13–14 *with* '452 patent at 5:38-48.

All that is left of claims 1 and 5 beyond the abstract idea of preparing and transmitting data using the conventional technology and methods of generic computers, a P2P network, and segmentation of data for transmission is the consumption of common content by peers at the same time and claim 5's automatic identification of a peer node in close proximity to the client requesting data. But the '452 patent does not explain *how* either of these results are accomplished; it simply states that it is. '452 patent at 4:52-58 ("The content recipients have a peerness established and/or defined by the common content they are receiving from the CDN server; the systems and methods automatically identify peer nodes receiving common content and create dynamic network communication connection for the peer nodes to transmit that common content to each other . . . ."); *id.* at 5:44-48 ("The content delivery server further identifies those peer nodes that are in close network proximity to each other and uses them to distribute content to each other to create more efficient content delivery thereby."). The patent repeatedly states that "the peerness of the peer nodes is defined by their common content," *see, e.g.*, *id.* at 6:46-63, but there is no explanation in the specification or the claims of how the content delivery server computer or a peer node would recognize that other peer nodes are consuming the same content. Similarly, the specification broadly asserts:

> While proximity of physical location is important, it is primarily the

[1] The amended complaint quotes from the file history of the '452 patent, and therefore incorporates the file history by reference, allowing the Court to properly consider the file history in ruling on this Rule 12(b)(6) motion. *Khoja*, 899 F.3d at 998.

> network proximity or network distance that is also used to determine the dynamic P2P networks among peer nodes, based upon the network routing required. Groups are preferably within the same subnetwork of an internet service provider (ISP) for the nodes. Also, load balancing is a factor considered in determining the dynamic P2P networks. A content delivery network where the video content originates includes a series of servers; preferably, the closest network distance to those is included in the dynamic P2P networks.

*Id.* at 6:20-30. The patent does not explain how the content delivery server computer or a peer node transmitting data would recognize other nodes in close network proximity. Such results-based claims using only conventional technology do not render claims patent-eligible. *See Affinity Labs*, 838 F.3d at 1263 (holding that claim is not patent-eligible at step two because "it does not provide an inventive solution to a problem in implementing the idea of remote delivery of regional broadcasting; it simply recites that the abstract idea of remote delivery will be implemented using the conventional components and functions generic to cellular telephones"); *Alice*, 573 U.S. at 223 (holding that reciting an abstract idea "while adding the words 'apply it'" is not enough for patent eligibility at step two) (citation omitted).

Accordingly, the Court finds that the '452 patent lacks an inventive concept at step two and is patent-ineligible under § 101. Because the Court finds that the '452 patent is invalid under § 101, it does not address Kollective's argument under Rule 12(b)(6) that CEI has failed to adequately allege that the SD ECDN product practices each and every limitation of the asserted claims.

## IV. CONCLUSION

Because the '452 patent is directed to patentable ineligible subject matter under § 101, the Court GRANTS Kollective's motion to dismiss. CEI did not request leave to amend, and because the Court finds that amendment would be futile, the complaint is DISMISSED without leave to amend.

**IT IS SO ORDERED.**

Dated: June 21, 2021

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

COOPERATIVE ENTERTAINMENT, INC.,

Plaintiff,

v.

KOLLECTIVE TECHNOLOGY, INC.,

Defendant.

Case No. 5:20-cv-07273-EJD

**JUDGMENT**

On June 21, 2021, the Court granted Defendant Kollective Technology, Inc.'s Motion to Dismiss. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby ENTERS judgment in favor of Defendant Kollective Technology, Inc. and against Plaintiff Cooperative Entertainment, Inc.

The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated: June 21, 2021

EDWARD J. DAVILA
United States District Judge

US009432452B2

(12) **United States Patent**
**Gibson et al.**

(10) **Patent No.: US 9,432,452 B2**
(45) **Date of Patent: Aug. 30, 2016**

(54) **SYSTEMS AND METHODS FOR DYNAMIC NETWORKED PEER-TO-PEER CONTENT DISTRIBUTION**

(71) Applicants: **William James Gibson**, Apex, NC (US); **Juan Royston Benito**, Raleigh, NC (US); **Jason Philip Henry Bradicich**, Apex, NC (US)

(72) Inventors: **William James Gibson**, Apex, NC (US); **Juan Royston Benito**, Raleigh, NC (US); **Jason Philip Henry Bradicich**, Apex, NC (US)

(73) Assignee: **Joosy, Inc.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 196 days.

(21) Appl. No.: **14/023,172**

(22) Filed: **Sep. 10, 2013**

(65) **Prior Publication Data**

US 2014/0074991 A1 Mar. 13, 2014

**Related U.S. Application Data**

(60) Provisional application No. 61/699,083, filed on Sep. 10, 2012.

(51) **Int. Cl.**
***G06F 15/16*** (2006.01)
***H04L 29/08*** (2006.01)

(52) **U.S. Cl.**
CPC ............ ***H04L 67/104*** (2013.01); ***H04L 67/06*** (2013.01); ***H04L 67/1021*** (2013.01); ***H04L 67/1074*** (2013.01); *H04L 67/1044* (2013.01)

(58) **Field of Classification Search**
CPC . H04L 67/104; H04L 67/1074; H04L 67/06; H04L 67/1044
USPC .......................................................... 709/219
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,857,012 | B2 | 2/2005 | Sim et al. | |
| 7,149,797 | B1 * | 12/2006 | Weller | G06Q 40/04 370/254 |
| 7,512,943 | B2 | 3/2009 | Hester et al. | |
| 7,567,987 | B2 | 7/2009 | Shapell et al. | |
| 7,594,030 | B2 | 9/2009 | Teodosiu et al. | |
| 7,603,464 | B2 | 10/2009 | White et al. | |
| 7,672,235 | B1 * | 3/2010 | Lian et al. | 370/230 |
| 7,903,652 | B2 | 3/2011 | Huang et al. | |
| 8,073,978 | B2 * | 12/2011 | Sengupta | G06F 17/30864 370/401 |
| 8,122,098 | B1 | 2/2012 | Richardson et al. | |
| 8,166,154 | B2 | 4/2012 | Choi | |
| 2004/0246921 | A1 | 12/2004 | Bates et al. | |
| 2004/0249888 | A1 | 12/2004 | Berkey et al. | |
| 2005/0216473 | A1 * | 9/2005 | Aoyagi et al. | 707/10 |
| 2006/0031537 | A1 | 2/2006 | Boutboul et al. | |
| 2006/0265401 | A1 | 11/2006 | Edmond et al. | |
| 2007/0214207 | A1 * | 9/2007 | Xie et al. | 709/201 |
| 2008/0189617 | A1 | 8/2008 | Covell et al. | |
| 2008/0273541 | A1 * | 11/2008 | Pharn | 370/400 |
| 2009/0055461 | A1 | 2/2009 | Georgis et al. | |
| 2009/0083390 | A1 * | 3/2009 | Abu-Ghazaleh et al. | 709/209 |
| 2010/0070570 | A1 | 3/2010 | Lepeska | |
| 2010/0198992 | A1 | 8/2010 | Morrison et al. | |
| 2011/0128889 | A1 * | 6/2011 | Liao et al. | 370/255 |
| 2011/0271275 | A1 * | 11/2011 | Ochi et al. | 717/177 |
| 2012/0102535 | A1 | 4/2012 | Weintraub et al. | |
| 2012/0191778 | A1 | 7/2012 | Kim et al. | |
| 2012/0221646 | A1 | 8/2012 | Ciminiera et al. | |
| 2012/0221647 | A1 | 8/2012 | Ciminiera et al. | |

* cited by examiner

*Primary Examiner* — Viet Vu
*Assistant Examiner* — Herman Belcher
(74) *Attorney, Agent, or Firm* — Triangle Patents, PLLC

(57) **ABSTRACT**

Peer-to-peer (P2P) dynamic networks and/or sub-networks for file distribution between peers receiving the same content, wherein nodes are outside controlled networks and/or content distribution networks (CDNs), and wherein large data files are distributed or shared across and among the peer nodes.

**15 Claims, 14 Drawing Sheets**




Server
Client
Other Clients
Store viewer information
Check content request
Use trace route to segment
Find peers/neighbors
Return client-block pairs
Initiate Communication
Repeat as needed
Client a
Client b
Client c
CDN
Request client-block pairs
Request blocks from clients
Render/play/use content
Return additional client-block pairs
Completed content stream
Return results/metrics
Store for metrics

Fig. 1




Fig. 2




Fig. 3




Fig. 4




Fig. 5




Fig. 6




Fig. 7




Fig. 8




Fig. 9


Architecture
Webkit or browser plug-in
Content viewer/ game player
Grid Computing
Games and content via flash and HTML5
Cloud
Content Provider
Customer
$$ for services

Fig. 10


Profile Client Content Items
Profile Network Location
Profile Network Bandwidth
<extends>
<extends>
<extends>
Profile Network
<extends>
Profile Client
<extends>
Add Client to Client Profiles
Add Client to Network Graph
<extends>
<extends>
Add Client
<extends>
Add Client to Group for Active Content Item
Add Client to Groups for other Content Items on their Device
<extends>
<extends>
Add Client to Content Item Groups
<extends>
Register
<uses>
Request Stream Source List
Client

Fig. 11


Remove Client from Client Profiles
Remove Client from Network Graph
Remove Client from Group for Active Content Item
Remove Client from Groups for other Content Items on their Device
<extends>
<extends>
<extends>
<extends>
Remove Client
Remove Client from Content Item Groups
<extends>
<extends>
Withdraw
<uses>
Submit Report
Client

Fig. 12



Get Client Profile Information
Get Client Network Information
<extends>
<extends>
Get Clients for Content Item
Get Client Information
Rank Clients
<extends>
<extends>
<extends>
Request Stream Source List
<uses>
Submit Report
Client


Fig. 13


Update QoS for Stream Source
Log Client Performace
<extends>
<extends>
Submit Report
Client

Fig. 14

## SYSTEMS AND METHODS FOR DYNAMIC NETWORKED PEER-TO-PEER CONTENT DISTRIBUTION

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 61/699,083, filed Sep. 10, 2012.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to peer-to-peer network content distribution.

2. Description of the Prior Art

Generally, it is known in the relevant prior art to provide peer-to-peer (P2P) networks via the internet for sharing digital content, including video, for live streaming service over content distribution networks (CDNs). By way of example, relevant documents include the following:

U.S. Patent Pub. No. 20120221646 by Ciminiera, et al. for "Caching of Digital Contents in P2P Networks," filed Nov. 13, 2009, describing a method for enabling sharing of content files among nodes of a P2P network, comprising sub-networks each including a respective plurality of nodes capable of storing content files.

U.S. Patent Pub. No. 20040249888 by Berkey, et al. for "Command and control of arbitrary resources in a peer-to-peer network," filed May 12, 2004, disclosing a method and apparatus for virtualizing access to resources in a distributed peer-to-peer (P2P) network.

U.S. Patent Pub. No. 20120191778 by Kim, et al. for "Content Distribution Network for Supporting Peer-to-Peer Live Streaming," filed Jan. 28, 2011, describing a method and system for providing a Peer-to-Peer (P2P) live streaming service over a Content Distribution Network (CDN).

U.S. Patent Pub. No. 20120102535 by Weintraub, et al. for "Content Storage and Delivery System and Associated Method and Device," filed Nov. 9, 2011, disclosing a system for the storage of content on a network and the delivery of content to subscriber locations. Content is delivered over a packet-switching network according to a peer to peer file distribution protocol.

U.S. Patent Pub. No. 20100070570 by Lepeska for "Dedicated Shared Byte Cache," filed Sep. 10, 2009, relates to methods, apparatus, and systems for providing peer-to-peer network acceleration.

U.S. Patent Pub. No. 20080189617 by Covell, et al. for "Distributed Video Content Management and Sharing System," filed Jan. 22, 2008, describing a system which enables cooperative rich media content management, sharing, and publishing across a distributed set of websites, web servers, and media servers based on control information in an online database.

U.S. Patent Pub. No. 20060265401 by Edmond, et al. for "Grid Network for Distribution of Files," filed May 19, 2006, disclosing a system including first server nodes having authentication functions coupled to a network, wherein the system also includes second server nodes having repositories of complete files also coupled to the network, and still further includes a set of client nodes having local repositories for files coupled to the network.

U.S. Patent Pub. No. 20040246921 by Bates, et al. for "Method and System for persisting content in a decentralized network," filed May 27, 2004, describing methods to ensure that content defining a sub-grid of a decentralized network continues to be provided to the sub-grid upon departure of a node from the sub-grid that has been responsible for providing the content.



U.S. Patent Pub. No. 20060031537 by Boutboul, et al. for "Method, system, and program product for optimized concurrent data download with a grid computing environment," filed Jun. 8, 2004, teaching a grid computer system having a plurality of download servers in network communication with client computers and a download management system, a client requests a download plan from the download management system for downloading data in parallel from the plurality of download servers to a client.

U.S. Patent Pub. No. 20120221647 by Ciminera, et al. for "Sharing of Digital Contents in P2P Networks Exploiting Localization Data," filed Nov. 3, 2009, disclosing a method for enabling sharing of content files among nodes of a P2P network is provided. The P2P network comprises sub-networks each including a respective plurality of nodes capable of storing content files.

U.S. Patent Pub. No. 20100198992 by Morrison, et al. for "Synchronization of audio and video signals from remote sources over the internet," filed Apr. 8, 2010, describing an architecture and technology for a method for synchronizing multiple streams of time-based digital audio and video content from separate and distinct remote sources, so that when the streams are joined, they are perceived to be in unison.

U.S. Patent Pub. No. 20090055461 by Georgis, et al. for "System and method for effectively optimizing content segment downloads in an electronic network," filed Aug. 23, 2007, disclosing a system and method for optimizing content distribution in an electronic network includes a peer-to-peer network of client devices; also, including an optimization module from a tracking server iteratively redistributes said content segments among the client devices to seek an optimal content segment configuration of said content segments for optimizing performance characteristics of content reassembly procedures.

U.S. Pat. No. 7,903,652 by Huang, et al. for "System and method for peer to peer video streaming," filed Dec. 14, 2006, teaching, in an Internet Protocol Television (IPTV) system, an IPTV server is configured to receive a request from an IPTV content storage device (CSD) to view a video stream. The IPTV server selects a set of peers for the IPTV CSD, and transmits the set of peers to the IPTV CSD.

U.S. Pat. No. 7,512,943 by Hester, et al. for "Distributed caching of files in a network," filed Aug. 30, 2005, disclosing distributed caching and download of a filing, including a method for building a peer list comprising a listing of potential peer servers from among one or more networked computers.

U.S. Pat. No. 7,567,987 by Shappell, et al. for "File Sharing in P2P group shared spaces," filed Oct. 24, 2003, describing a computer implemented method and system enable users to share files in a server-less shared space, by providing access to such spaces via a visual presentation, the system renders content available for access by other group members.

U.S. Pat. No. 7,594,030 by Teodosiu, et al. for "Locator and tracing service for peer to peer resource," filed Sep. 13, 2001, including a resource naming service (RNS) server receives peer resource request from peer platforms through a networking environment.

U.S. Pat. No. 8,122,098 by Richardson, et al. for "Managing content delivery network service providers by a content broker," filed Nov. 17, 2008, describing a system,

method, and computer readable medium for managing network storage provider and CDN service providers are provided.

U.S. Pat. No. 6,857,012 by Sim et al. for "Method and apparatus for initializing a new node in a network," filed May 18, 2001, teaching a method for initializing a new node in a network. The network has multiple nodes arranged in a virtual tree format.

U.S. Pat. No. 7,603,464 by White, et al. for "Method and system for identifying available resources in a peer-to-peer network," filed May 27, 2004, disclosing a method for a peer of a peer-to-peer network to search for an available resource is provided, including a peer-to-peer grid and system for publishing and identifying an available resource in a peer-to-peer distributed network are also provided.

U.S. Pat. No. 8,166,154 by Choi for "Method for streaming multimedia content," filed Aug. 13, 2005, describing streaming multimedia content from a content server to client, user multimedia devices (UMDs) connected to the content server through a network includes the steps of monitoring storage states, of UMDs connected to the network, for present multimedia content, and automatically transmitting a starting block of the content to any UMD not yet storing the block; also, tasks preparatory to streaming are advantageously offloaded to the client side and distributed among UMDs, to realize reduced bandwidth and delay and to conserve on storage capacity of a UMD.

U.S. Pat. No. 8,117,306 by Baumback, et al. for "Optimizing content management," filed Sep. 29, 2008, teaching a system and method for monitoring the performance associated with fulfilling resource requests and determining optimizations for improving such performance are provided, including the use of a CDN/CDN service provider.

The prior art fails to provide video streaming over P2P networks outside the structure and control of CDNs.

## SUMMARY OF THE INVENTION

The present invention relates to peer-to-peer (P2P) dynamic networks and/or sub-networks, wherein nodes are outside controlled networks and/or content distribution networks (CDNs), and wherein large data files are distributed or shared across and among the peer nodes. Furthermore, the peers are only those that are consuming the same content, i.e., the P2P connection is because of the content commonality.

It is an object of this invention to provide P2P dynamic networks and/or sub-networks for file distribution between peers receiving the same content. Accordingly, a broad embodiment of this invention is directed to, by way of example, embodiments of the present invention include dynamic networks base upon a trace route, e.g., CDN internet protocol (IP) addresses.

Another object of the present invention is to provide dynamic P2P networks for distribution of large data file(s) to recipient peer nodes, wherein the dynamic P2P networks are outside a static network of controlled systems.

Still another object of the present invention is to provide dynamic P2P networks for real-time or near-real-time distribution of digital content to a multiplicity of peer nodes within the network, wherein the peer nodes are established and/or defined based upon their consumption of the same content, i.e., the peer nodes are receiving the same content.

These and other objects and aspects of the present invention will become apparent to those skilled in the art after a reading of the following description of the preferred embodiment when considered with the drawings, as they support the claimed invention.



## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic diagram of one embodiment of the invention.

FIGS. **2-9** are schematic diagrams of additional embodiments of the invention.

FIG. **10** is a schematic diagram of another embodiment of the invention.

FIG. **11** is a schematic diagram of the invention illustrating use cases for a registration function.

FIG. **12** is a schematic diagram of the invention illustrating use cases for a withdraw function.

FIG. **13** is a schematic diagram of the invention illustrating use cases for a request stream source list function.

FIG. **14** is a schematic diagram of the invention illustrating use cases for a submit report function.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to the drawings in general, the illustrations are for the purpose of describing a preferred embodiment of the invention and are not intended to limit the invention thereto.

The present invention provides systems and methods for peer-to-peer (P2P) dynamic networks and/or sub-networks for file distribution between peers receiving the same content. Accordingly, a broad embodiment of this invention is directed to, by way of example, embodiments of the present invention include dynamic networks based upon a trace route or other dynamic network segmentation strategy, e.g., content delivery networks (CDN) internet protocol (IP) address. In particular, any instance of large data file distribution to recipient peer nodes is considered within the scope of the present invention, including but not limited to video file distribution, game content distribution, large data files, and combinations thereof. Any packet and/or stream of data that is ordered correctly and delivered in a timely way is considered the content for distribution within the P2P dynamic networks and/or sub-networks of the present invention.

By way of contrast to prior art content delivery networks, the systems and methods of the present invention, which include virtualized computing networks and content delivery origination server(s) for dynamic network-based P2P content distribution, provide more efficient and reduced cost of delivery for the content, as well as optionally providing live streaming for video and/or audio content as well as data, files, analytics, and combinations thereof. The content recipients have a peerness established and/or defined by the common content they are receiving from the CDN server; the systems and methods automatically identify peer nodes receiving common content and create dynamic network communication connection for the peer nodes to transmit that common content to each other, rather than the content being directed from the CDN server directly to each recipient node.

Systems and methods of the present invention provide for content delivery to a multiplicity of peer nodes within P2P dynamic networks and/or sub-networks, wherein the file distribution occurs between peers receiving the same content. Accordingly, a broad embodiment of this invention is directed to, by way of example, embodiments of the present invention include dynamic networks base upon at least one

trace route, e.g., CDN internet protocol (IP) addresses. Preferably, the present invention does not require any naming outside the IP addresses for peer nodes.

Preferably, the systems and methods of the present invention provide for dynamic P2P networks distributing digital content in real-time or near-real-time to a multiplicity of peer nodes within the network, wherein the peer nodes are established and/or defined based upon their consumption of the same content, i.e., the peer nodes are receiving the same content.

It will be appreciated by one of ordinary skill in the art that the embodiments of the present invention described herein assume the use of existing audio and/or video playback. Advantageously, this corresponds to systems and methods for P2P content distribution among peers of a dynamic network or sub-network without requiring new compression or playback for efficient distribution. Furthermore, the content distributed via the peer nodes of the present invention does not establish the "peerness" or the P2P connections is not physical location-dependent, control-dependent, or ownership-dependent; in other words, the peerness of peer nodes of the present invention are established by the commonality of the content consumed therebetween. The P2P distribution of content according to the systems and methods of the present invention provide for cached content at each peer node; there is no stored content among the peer nodes.

Beneficially, the present invention systems and methods provide increased reliability, more redundancy, and more efficient delivery than those of the prior art. A content delivery server originates distribution of at least one predetermined piece of content over dynamic network(s) and/or sub-network(s) as illustrated in the figures. The content delivery server of the present invention identifies the peer nodes for at least one piece of content; those peer nodes having content in common are identified and used for the distribution within that dynamic network; new peer nodes are added for common content with other peer nodes. Peer nodes or content recipients of the same content provide for redirected content delivery among peer nodes (or users), thereby by-passing any established or static content delivery network (CDN); advantageously, this saves time, improves redundancy, and also reduces or eliminates costs for content delivery over the CDN for the peer nodes. The content delivery server further identifies those peer nodes that are in close network proximity to each other and uses them to distribute content to each other to create more efficient content delivery thereby.

Factors for balancing or managing distribution of the P2P content delivery over dynamic networks associated with the present invention include segmentation based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, other server side scheduling/resource allocation techniques, and combinations thereof. Management of peer distribution is preferably centrally managed, although some level of management may be offloaded to client peers.

In one embodiment of the present invention, the systems and methods of the present invention may be integrated with applications (Apps) for mobile devices, including but not limited to smart phones, tablet computers, mobile computers, mobile communication devices, and the like, and combinations thereof. However, no customized or proprietary software download to the peer node content recipient devices is required for the systems and methods of the present invention. By way of example, existing technologies



and/or software that may be used to download peer node content include either Adobe Flash or a combination of W3C standards WebRTC and MediaSource, along with modern web browsers like WebKit, Google Chrome, Apple Safari, Mozilla, and/or MS IE. The present invention dynamic networking of peer nodes easily integrates with existing websites and Apps that provide for content distribution and/or delivery over the Internet or other CDN. Furthermore, by contrast to the prior art, there is no unique content delivery network registration required for peer node operation and dynamic network content distribution according to the present invention.

In another embodiment of the present invention, by way of example and not limitation, streaming video is provided by at least one content server constructed and configured in remote physical location or remote network distance from a multiplicity of peer node content recipient devices, all of which are configured in network-based communication with each other, over at least one network and/or sub-network. While proximity of physical location is important, it is primarily the network proximity or network distance that is also used to determine the dynamic P2P networks among peer nodes, based upon the network routing required. Groups are preferably within the same subnetwork of an internet service provider (ISP) for the nodes. Also, load balancing is a factor considered in determining the dynamic P2P networks. A content delivery network where the video content originates includes a series of servers; preferably, the closest network distance to those is included in the dynamic P2P networks. By way of example and not limitation, a routing table including IP addresses of the source of the video content provides a grouping mechanism and a sorting mechanism to provide at least one grouping of peer nodes having the common content. This is illustrated in FIG. **11** for the Register function, at the step of adding client to content item group.

The at least one content server originates at least one content piece for distribution over the network(s) and/or sub-network(s) to the peer nodes and their corresponding content recipient devices, wherein the peer nodes are connected in dynamic network-based (IP-based) communication for receiving and sharing the same content with each other, wherein the peerness of the peer nodes that initiates their cross-communication is based upon common content that each is receiving from the server(s).

Also, the systems and methods of the present invention, in particular as illustrated in the figures, and more particularly in FIGS. **11-14**, include implementation for dynamic peer-to-peer (P2P) network-based, IP-based communication among peer nodes, wherein the peerness of the peer nodes is defined by their common content. In one embodiment of the present invention, the dynamic P2P networks are scalable to provide for a single dynamic P2P network among peer nodes, so long as all peer nodes have common content. Preferably, the dynamic P2P networks include small groups of peer nodes, between about five to about 100 peer nodes, all having common content. More preferably, the dynamic P2P networks include small groups of peer nodes, between about five (5) and about twenty (20) peer nodes all having common content. And more preferably still, the dynamic P2P networks include small groups of peer nodes, between about eight (8) and about ten (10) peer nodes having common content defining their peerness. The number of peer nodes determines the number of common connections, which is affected by the IP protocol being used; thus, a single "hop" is preferred over "leapfogging" among the peer nodes. If there are too many peer nodes the repeat is slowed, and

switching among processors and servers is costly. Also, if the groups are too small, e.g., two (2) peer nodes, there may be some disconnectivity; this problem is solved by at least about five (5) peer nodes because the multiplicity of peer nodes having common content provides connections that may not be available between each of the peer nodes directly. The minimum number of peer nodes in any group forming a dynamic P2P network having common content sharing is determined by the number required for reliability; the maximum number is determined by the number that provides for the common content sharing to be managed and to maintain connection for communication of the common content for simultaneous viewing by the users associated with the peer nodes. Methods of the present invention include a step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id. The automatic determination of group size for the P2P dynamic networks according to the present invention is important for performance and ability to manage issues to a single or multiplicity of clients in the group but balanced by a need to reduce system resources needed to keep connections to all group members. Also, the methods of the present invention further include the step of the system dynamically reassigning clients to other groups, for example as needed for reasons like dissolution of a group due to loss/lowering of group member count, splitting a group that grew too large, and QoS metrics dictated different grouping.

Significantly, the present invention common content is most preferably a video content that is common among the peer nodes. By way of contrast to prior art, which may include video games being played simultaneously by remote users, or audio content, which is typically not simultaneous common content, the video common content is at least 10 times larger or even 100 times larger, and so the small groups of peer nodes forming the dynamic P2P networks of the present invention provide for smooth playback and avoids stuttering problems or delays or buffering problems. The volume of video content that is common among the peer nodes at the time of viewing creates a critical factor of timeliness for the content sharing among the peer nodes having common content at the same time, for providing peer node coordination and cooperation. The common content that defines the peerness of the peer nodes within a dynamic P2P network for video sharing includes common content and common temporality of the common content. The need for peer nodes to share in real-time or near-real-time all while the users are viewing the video content via the remote, distributed peer nodes provides a session constraint that does not exist with prior art gaming or prior art audio sharing, which most commonly is shared offline, not during concurrent use by the peer nodes users. Thus, for video, the common content that defines the peer nodes and their peerness for creating the dynamic P2P network is the same video. By way of example and not limitation, a television show, an instructional video, any entertainment video provided over the web, such as by YouTube, NetFlix, or any streaming video broadcast or on-demand are included within the present invention. The common content is the moving video stream with coordinated audio, which defines the peerness and is used to determine the dynamic P2P network among those peer nodes with the common content.

FIG. **1** is a schematic diagram of one embodiment of the invention.

In one embodiment of the invention, a server database includes content information (e.g., URL, listing of encodings, customer), metrics (e.g., content, connection history, performance, trends, miss count/CDN requests, client/CDN addresses), and active viewers/sessions (e.g., content; viewer info-system, address, . . . ; routing—CDN addresses, route trace, grouping; blocks available and requested; service information and history).

FIGS. **2-9** are schematic diagrams of additional embodiments of the invention. In these figures, embodiments of live streaming synchronized viewing processes are represented. Content playback is slightly delayed, like normal streaming, and the streaming media is broken up into smaller segments. Segments are downloaded as needed—preference is to obtain from other viewers (a, b, c, d, e . . . n) but will default to CDN if needed. Viewers are grouped by network “closeness.” Downloading of content looks like “leap-frog” or bicycling peloton. In FIG. **2**, the server directs viewers to pre-fetch an initial segment. In FIG. **3**, viewer a: segment **1** (CDN), segment **2** (viewer b), segment **3** (viewer c), segment **4** (viewer d), segment **5** (viewer e). In FIG. **4**, viewer b: segment **1** (viewer a), segment **2** (CDN), segment **3** (viewer c), segment **4** (viewer d), segment **5** (viewer e). In FIG. **5**, viewer c: segment **1** (viewer a), segment **2** (viewer b), segment **3** (CDN), segment **4** (viewer d), segment **5** (viewer e). In FIG. **6**, viewer d: segment **1** (viewer a), segment **2** (viewer b), segment **3** (viewer c), segment **4** (CDN), segment **5** (viewer e). In FIG. **7**, viewer e: segment **1** (viewer a), segment **2** (viewer b), segment **3** (viewer c), segment **4** (viewer d), segment **5** (CDN). In FIG. **8**, viewer n: segment **1** (viewer a), segment **2** (viewer b), segment **3** (viewer c), segment **4** (viewer d), segment **5** (viewer e), segment n (CDN). In FIG. **9**, viewer a: segment n (viewer n), segment n+1 (CDN), segment n+2 (viewer b), segment n+3 (viewer c).

FIG. **10** is a schematic diagram of another embodiment of the invention, which illustrates the business process employed with a calculation/processing cycle harvesting ecosystem. The main points are peer nodes that process calculations and are rewarded by consuming online entertainment or other content. End users of calculations pay for the results. The payment is used to defray the cost of content license, distribution, and revenue back to the dynamic CDN distribution server and/or service provider.

FIG. **11** is a schematic diagram of the invention illustrating use cases for a registration function. A client icon is illustrated at an initiation of the registration function and corresponding steps. From a register step, a profile client is provided, including profile client content items and a profile network including subcomponents of profile network location and profile network bandwith. Also from the register step, add client is provided, including add client to client profiles and another option of add client to network graph. Additionally, from the register step, add client to content item groups, further including the steps of add client to group for active content item and add client to groups for other content items on their device(s). Also, request stream source list function extends from the register function step(s).

FIG. **12** is a schematic diagram of the invention illustrating use cases for a withdraw function. From a withdraw step, a remove client is provided, including remove client from client profiles step and remove client from network graph, which are automatically initiated upon indication of withdraw request received by at least one server associated with the P2P networks of the present invention. Also, the steps of remove client from content item groups, which further includes the steps of remove client from group for active content item and remove client from groups for other content items on their device(s).

FIG. **13** is a schematic diagram of the invention illustrating use cases for a request stream source list function. From a request stream resource list step initiated by a client user, a profile client is provided, including the steps of get clients for content item, get client information, which includes other steps of get client profile information, and get client network information. Additional steps of rank clients and submit report follow.

FIG. **14** is a schematic diagram of the invention illustrating use cases for a submit report function that further includes the steps of update QoS for stream source and log client performance.

Advertisement associated with the content shared among the peer nodes is also provided according to systems and methods of the present invention. Precisely targeted advertisement related to the common content that defines the peerness, combined with the dynamic network communication of the present invention provide for optimized relevance or matching or advertising content with intended recipients. By way of example and not limitation, community-driven advertisement is a beneficial object of the present invention systems and methods.

Gaming and social media are further considered subject to P2P dynamic network distribution content for the present invention. Gaming and social media typically have updated content (e.g., static/unchanging items like new game levels, additional content, social information like photos and video) that could be pre-distributed instead of pulled by the user removing latency and wait during game play or social network activities. Additionally, it is possible to use peer nodes for distributed storage as well as additional (game-based/social network) database processing. Also, processing may be performed over the peer nodes. Corporate content or commercial data provide another example of content provided under the systems and methods of the present invention, wherein the peer nodes are users within a common corporation, organization, or entity. Specifically, examples of corporate content or commercial data include but are not limited to training videos, company events, files, and combinations thereof.

Advantageously, another aspect of the systems and methods of the present invention provide for simulation to leverage the hardware of the peer node content recipient devices for providing coordinated analytics, for example on large data sets. The data is retained within the community or peers (i.e., peer nodes determined by peerness or commonality of data being distributed thereto and/or therebetween). Thus, the present invention provides for leveraging communities sharing common content with each other over the dynamic network(s) and/or sub-network(s) without the content being distributed directly from the CDN server originating the content, and without the content distribution being limited or otherwise restricted by the established (static) CDN network(s). The systems and methods of the present invention provide for harnessing the content recipient devices to aggregate or assemble intelligent functionality of the devices unassociated with the content receipt, including but not limited to computational storage and processing capacity of the content recipient devices in the P2P dynamic network, as in grid computing applications for massively parallel computation in addition to the P2P content distribution and redundancy of online content distribution to receiving or recipient peer node devices.

In yet another beneficial application of the systems and methods of the present invention, economically driven incentives to peer nodes or content recipients include savings, compensation, points, credits, and combinations thereof, are provided for participation by the recipient devices (peer node devices receiving the common content), i.e., to encourage, promote, incentivize, or increase the number of peers for any piece of content, thereby providing elasticity of the dynamic CDN when the demand for any particular content is highest or at high levels for periods of time. A virtual currency may thus be provided to encourage the multiplicity of peer node content recipient devices to participate within the dynamic network(s) and/or sub-network(s) for receiving more content (for example viewing more video downloads) and thereby participating in more than one of the dynamic networks due to increased frequency and type of content.

Certain modifications and improvements will occur to those skilled in the art upon a reading of the foregoing description. The above-mentioned examples are provided to serve the purpose of clarifying the aspects of the invention and it will be apparent to one skilled in the art that they do not serve to limit the scope of the invention. All modifications and improvements have been deleted herein for the sake of conciseness and readability but are properly within the scope of the present invention.

The invention claimed is:

**1**. A system for virtualized computing peer-based content sharing comprising:

at least one content delivery server computer constructed and configured for electrical connection and communication via at least one communications network; and

at least one peer-to-peer (P2P) dynamic network including a multiplicity of peer nodes, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the multiplicity of peer nodes are constructed and configured for electronic communication over the at least one P2P dynamic network, wherein the at least one P2P dynamic network is based on at least one trace route; wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;

wherein the at least one content delivery server computer is operable to store viewer information, check content request, use the trace route to segment requested content, find peers, and return client-block pairs;

wherein distribution of P2P content delivery over the at least one P2P dynamic network is based on content segmentation;

wherein content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques.

**2**. The system of claim **1**, wherein large data files are distributed or shared across and/or among the peer nodes.

**3**. The system of claim **1**, the P2P connection among and/or across the peer nodes is provided because of a content commonality.

**4**. The system of claim **1**, further including sub-networks within the at least one P2P dynamic network.

**5**. A method for virtualized computing peer-based content sharing comprising the steps of:

providing at least one content delivery server computer constructed and configured for electrical connection and communication via at least one communications network;

providing at least one peer-to-peer (P2P) dynamic network including a multiplicity of peer nodes constructed and configured for electronic communication over the at least one P2P dynamic network, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the at least one P2P dynamic network is based on at least one trace route, wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;

the at least one content delivery server computer receiving at least one content request from a client;

the at least one content delivery server computer segmenting requested content based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques;

automatically identifying at least one peer node having at least one segment of the requested content in close network proximity to the client; and

at least one peer node most proximal to the client sharing the at least one segment of the requested content.

**6**. The method of claim **5**, further including the steps of automatically registering the client; adding the client; and adding the client to content item groups.



**7**. The method of claim **5**, further including the steps of getting client information and getting clients for the requested content item.

**8**. The method of claim **7**, further including the step of ranking clients based upon client profile information and client network information.

**9**. The method of claim **8**, further including the step of providing the content for the client to play or view the content.

**10**. The method of claim **5**, further including the step of the system automatically grouping clients into groups having between about 5 and about 100 clients.

**11**. The method of claim **5**, further including the step of the system automatically grouping clients into groups having between about 5 and about 20 clients.

**12**. The method of claim **5**, further including the step of the system automatically grouping clients into groups having between about 8 and about 10 clients.

**13**. The method of claim **5**, further including the step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id.

**14**. The method of claim **5**, further including the step of the system dynamically reassigning clients to other groups.

**15**. The method of claim **5**, further comprising providing economically driven incentives to peer nodes for participation in the at least one P2P dynamic network.

* * * * *

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this document contains 11,895 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Time New Roman.

Date: November 19, 2021

*/s/ Matthew M. Wawrzyn*
*Counsel for Plaintiff-Appellant*